

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-4-1996

# Pennsylvania Dept. of Welfare v. US Dept. HHS

Precedential or Non-Precedential:

Docket 94-3692

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"Pennsylvania Dept. of Welfare v. US Dept. HHS" (1996). *1996 Decisions*. Paper 189.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/189

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 94-3692


COMMONWEALTH OF PENNSYLVANIA,
DEPARTMENT OF PUBLIC WELFARE,

Plaintiff-Appellant

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES;
UNITED STATES OF AMERICA; and
HHS DEPARTMENTAL APPEALS BOARD,

Defendants-Appellees.


APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


Argued:  July 20, 1995
Before:  SLOVITER, Chief Judge, SCIRICA
and McKEE, Circuit Judges

(Filed April 4, 1996)


JOHN A. KANE
Chief Counsel

JASON MANNE  (ARGUED)
Assistant Counsel

Office of Attorney General of Pennsylvania
Department of Public Welfare
1403 State Office Bldg.
300 Liberty Ave.
Pittsburgh, PA  15222

Counsel for Plaintiff-Appellant
Commonwealth of Pennsylvania


1

Department of Public Welfare

FRANK W. HUNGER
Assistant Attorney General

FREDERICK W. THIEMAN
United States Attorney

MARK B. STERN
CHRISTINE N. KOHL   (ARGUED)
Attorneys, Appellate Staff
Civil Division,
Department of Justice
10th & Pennsylvania Avenue, N.W
Washington, D.C.   20530-0001

Counsel for Defendants-Appellees
United States Department of Health and
Human Services ("HHS"); United States
of America; and HHS Departmental Appeals Board

OPINION OF THE COURT


McKEE, Circuit Judge

The Commonwealth of Pennsylvania appeals from a ruling of the United States Department of Health and Human Services ("HHS") Appeals Board.  The Board upheld a ruling by the Secretary of HHS that reduced the amount of funding for child support enforcement activities in Pennsylvania by the total amount of revenue generated by a Judicial Computerization Fee ("JCP Fee") assessed on each child support case filed in the Commonwealth.

The district court granted summary judgment against the Commonwealth of Pennsylvania  ("DPW" or "Commonwealth") and in favor of HHS, the United States, and the HHS Appeals Board

2

(collectively the "defendants"), and this appeal followed.  For the reasons that follow, we will affirm the ruling of the district court.

## I. BACKGROUND

In 1975, Congress enacted the Child Support Enforcement Act, which is incorporated into the Social Security Act as "Title IV-D."  See 42 U.S.C. § 651 et seq.  Under Title IV-D, the federal government provides funding through HHS to participating states to assist in obtaining and enforcing child and spousal support obligations, locating absent parents, and establishing paternity. See 42 U.S.C. §§ 651, 655.  The United States currently pays each state 66 percent of the "total amounts expended by such State during such quarter for the operation of the plan," and 90 percent of other specified expenses.  42 U.S.C §§ 655(a)(1)(A), (a)(1)(B), (a)(1)(C), and (a)(2)(C).  The Title IV-D program complements the federal-state Aid to Families with Dependant Children program under Title IV-A of the Social Security Act ("AFDC") and is intended to reduce state and federal expenditures often necessitated by the failure of noncustodial parents to meet their support obligations.

In order to participate in the Child Support Enforcement program, each state must submit a plan for HHS approval in which the state designates the specific organizational unit or agency responsible for administering the program -- i.e. "the IV-D agency."  See 42 U.S.C. §654(3).  The plan must provide, inter alia, that the state will undertake, when necessary, to establish

3

the paternity of children, to locate absent parents, and to collect financial support for children through various means, such as wage withholding, property liens, withholding of unemployment compensation, and interception of tax refunds. See 42 U.S.C. §§ 654(4), (5), (6); 664; 666(a)(1), (3), (4), (b)(1), (8).

The Commonwealth of Pennsylvania is a participant in the Child Support Enforcement program and thus receives Title IV-D funding from the federal government. The Pennsylvania Department of Public Welfare ("DPW") is the designated IV-D agency under the Commonwealth's operating plan. However, Pennsylvania's Title IV-D program is administered by the Domestic Relations Section of each county Court of Common Pleas under a cooperative agreement with the Department of Public Welfare.

In 1981, Congress enacted § 455(a) of the Social Security Act, 42 U.S.C. § 655(a), which requires states participating in the Child Support Enforcement program to reduce their claims for Title IV-D reimbursement by an amount "equal to the total of any fees collected or other income resulting from services provided under the plan approved under this part." Thereafter, the Secretary of HHS promulgated a regulation implementing this "program income" exclusion of 42 U.S.C. § 655(a)(1). See 45 C.F.R. § 304.50. That regulation provides that:

> The IV-D agency must exclude from its quarterly expenditure claims an amount equal to:
>
> (a) All fees which are collected during the quarter under the title IV-D State plan; and

4

> (b) All interest and other income earned during the quarter resulting from services provided under the IV-D State plan.

45 C.F.R. § 304.50.

In 1990, the Pennsylvania Legislature enacted a law that imposes the aforementioned $5.00 JCP fee on all initial court filings. That fee was enacted in order to provide a dedicated funding source for the computerization of Pennsylvania's courts. In child support cases, the JCP fee is collected by either the Domestic Relations section of the particular court, or the Prothonotary, and these offices hold the fee in trust for the Pennsylvania Supreme Court. The parties here agree that this fee cannot be used for child support purposes and must, instead, be transferred to the Pennsylvania Department of Revenue which makes the money available to the Supreme Court for computerization of the courts. This court computerization program does not, however, include the computerization of the child support system which is funded by other sources.

Upon learning of the JCP fee, the Secretary of HHS announced that she would consider the fee collected on IV-D cases to be "program income" under the Title IV-D program because the fee "resulted from" child support services. Accordingly, in 1993, the Secretary notified the Commonwealth that HHS was disallowing a total of $102,241 in claims that Pennsylvania had made for federal funding under the Child Support Enforcement program. The Secretary's disallowance letters explained that because this extra $5.00 court filing fee is collected "as a direct result of

5

the applicant's request for IV-D services, the fee results from services provided under the IV-D State plan."  The letters further explained that, in accordance with 42 U.S.C. § 655(a)(1) and 45 C.F.R. § 304.50, HHS was treating the JCP fees collected in connection with child support and paternity actions as program income that reduces net expenditures for purposes of funding under the Title IV-D program.

The Commonwealth appealed these disallowances to the HHS Appeals Board.  The Commonwealth challenged the Secretary's conclusion that the funds in question were "program income" as the funds could only be used for computerization, and furthermore, the computerization did not even include computerization of the court's domestic relations activities. The Commonwealth also challenged the Board's authority to adjudicate the appeal.  The Commonwealth argued that the members of the Board were appointed in violation of the Appointments Clause of the United States Constitution, U.S.C.A. Const. Art 2, § 2, cl.2., and that the appointment was also in violation of civil service regulations thus invalidating any action taken by the Board.

## A. Proceedings Before the HHS Appeals Board.

The Secretary of HHS created the HHS Appeals Board in the early 1970's by a regulation promulgated under 45 C.F.R. Part 16. The regulation gave the Board the responsibility of resolving disputes such as the one now before us.  Congress thereafter gave the Board additional authority including the ability to resolve quality control disputes under the AFDC program of Title IV-A.

6

See 42 U.S.C. § 608(j). The Appeals Board is comprised of a Chairperson and four full-time Board members. The Secretary appoints each of the members of the Board.

The Appeals Board rejected the Commonwealth's challenge to its authority, and also rejected the Commonwealth's argument that the JCP fee is not IV-D "program income" under 42 U.S.C. §655(a)(1), and 45 C.F.R. § 304.50. The Board reasoned that 45 C.F.R. § 304.50 merely restates Title IV-D's requirement that fees collected from services provided under a state's Child Support Enforcement plan are income that must be excluded from any claim for federal funding. The Board concluded that the JCP fees in dispute "were charged as initial filing fees in conjunction with IV-D child support cases" and thus "directly generated by IV-D services." (App. 20a) The Board also noted that the Commonwealth treats other court filing fees received in connection with IV-D services as program income. (App. 181a-182a). Accordingly, the Board upheld the disallowances.

The Board relied in part upon its own precedent to reject the Commonwealth's claim that 45 C.F.R. § 74.41(c)(1) applies to this case. At the time of the Board's decision, that regulation stated: "[r]evenues raised by a government recipient under its governing powers, such as taxes, special assessments, levies, and fines" are not considered program income. 45 C.F.R. §74.41(c)(1) (1993). The parties stipulated that the JCP fees at issue constituted "special assessments", but the Board ruled that the more restrictive income exclusion provision of the statute takes precedence over the general language of the regulation. See 42

7

U.S.C. § 655(a)(1). The Board concluded that "the proper focus is on the receipt of income from grant-related activities, not on how the funds are expended." App. at 23a.

Nor did the Board believe that 45 C.F.R. § 304.21(b)(1) supported the Commonwealth's position. That regulation provides that federal funding is not available for court filing fees unless the court participating in the cooperative agreement with the state IV-D agency ordinarily pays such fees itself. The Board found that the Commonwealth failed to present any evidence that either the Department of Public Welfare or the Domestic Relations Sections pay court filing fees; rather, the Board concluded that the fees are paid by the litigants. After its original ruling, the Board upheld an additional disallowance of $24,861 in federal funding to the Commonwealth on the same grounds.

## B. Proceedings Before the District Court

The Commonwealth subsequently filed a complaint in the district court seeking judicial review of the Appeals Board's decision upholding the disallowances. In that complaint, the Commonwealth also sought declaratory and injunctive relief on the ground that the members of the Appeals Board were appointed in violation of both the Appointments Clause of the United States Constitution and civil service laws and regulations. The district court entered summary judgment for the defendants on all counts, and denied a Commonwealth motion for remand to allow the Appeals Board to consider a belatedly discovered HHS policy memorandum. The court held that the agency's construction of the

8

statute at issue is entitled to deference and that the Board's rulings were based on a reasonable construction of that statute. The court refused to find that the Board's composition was improper. This appeal followed.

## II. Discussion
### A. The Appointments Clause

The Commonwealth first contends that the members of the HHS Appeals Board were appointed in violation of the Appointments Clause of the United States Constitution. The Appointments Clause provides as follows:

> [The President] . . . shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the Supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law; but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. Art. II, § 2, cl. 2.

Thus, the Appointments Clause divides all officers into two classes: principal officers and inferior officers. Only the former are appointed subject to the advise and consent of the Senate. See Morrison v. Olson, 487 U.S. 654, 670 (1988). Accordingly, our inquiry must begin with an analysis of the nature of Board membership and a determination of whether the members are "principal officers" or "inferior officers." See Freytag v. Commissioner of Internal Revenue, 501 U.S. 868, 878 (1991).

9

However, since employees and lesser functionaries are not subject to the Appointments Clause, see id. at 880, we must determine if Appeals Board members are "officers" or "employees" for purposes of that Clause.  "[A]ny appointee exercising significant authority pursuant to the laws of the United States is an `Officer of the United States,' and must, therefore, be appointed in the manner prescribed by § 2, cl. 2, of Article II."  See Freytag, 501 U.S. at 881.  Title 45 C.F.R. § 16.13, entitled "Powers and responsibilities," sets forth the authority of the members of the Appeals Board. It provides:

> In addition to powers specified elsewhere in these procedures, Board members have the power to issue orders (including "show cause" orders); to examine witnesses; to take all steps necessary for the conduct of an orderly hearing; to rule on requests and motions, including motions to dismiss; to grant extensions of time for good reasons; to dismiss for failure to meet deadlines and other requirements; to close or suspend cases which are not ready for review; to order or assist the parties to submit relevant information; to remand a case for further action by the respondent; to waive or modify these procedures in a specific case with notice to the parties; to reconsider a Board decision where a party promptly alleges a clear error of fact or law; and to take any other action necessary to resolve disputes in accordance with the objectives of these procedures.  As will become apparent, the broad discretion vested in Appeals Board members and the substantive duties that they perform.

45 C.F.R. Part 16, Appendix A.  The broad discretion and authority vested in the Board clearly establishes that its members are officers and not employees, and the Board does not argue to the contrary.

10

Accordingly, we must address whether the Appeals Board members are "principal" or "inferior" officers. "The line between `inferior' and `principal' officers is one that is far from clear, and the Framers provided little guidance into where it should be drawn." Morrison, 487 U.S. at 671 (citation omitted). However, the Supreme Court has identified several factors that guide our inquiry. These include: (1) the scope of the officer's duties; (2) the scope of the officer's authority; (3) the length of the officer's tenure; and (4) whether the officer is subject to removal by a higher Executive Branch official. See Id. at 671-672.

In Morrison, the Court considered each of these factors and concluded that an independent counsel appointed under the Ethics in Government Act was an inferior officer. The independent counsel had been appointed by a Special Division of the United States Court of Appeals for the District of Columbia pursuant to 28 U.S.C. §§ 591 et seq.

> Briefly stated, [that statute] allows for the appointment of an independent counsel to investigate and, if appropriate, prosecute certain high-ranking Government officials for violations of federal criminal laws.

Morrison, 487 U.S. at 660. The independent counsel was given "full power and independent authority to exercise all investigative and prosecutorial functions and powers of the Department of Justice." Id. at 662. In addition, the authority of the Attorney General to remove the independent counsel was drastically curtailed and the independent counsel was given the power to seek judicial review of any attempted removal. See 28

11

U.S.C. §§ 596(a)(1). Nevertheless, despite the broad authority, discretion, and independence of the independent counsel, the Supreme Court concluded that the position was an inferior office under the Appointments Clause. First, the independent counsel was "subject to removal by a higher Executive Branch official," i.e. the Attorney General. This suggested that the independent counsel was "to some degree `inferior' in rank and authority." Morrison 487 U.S. at 671. Second, the counsel was "empowered by the Act to perform only certain, limited duties," which did "not include any authority to formulate policy." Id. at 671. Third, the counsel's office was limited in jurisdiction to certain federal officials suspected of certain serious federal crimes. Lastly, the counsel's office was limited in tenure because the appointment did not extend beyond the completion of the investigation and prosecution for which the counsel was appointed. Id. at 672.

The Commonwealth argues that application of the Morrison factors requires a conclusion that Appeals Board members are principal officers. In so arguing, the Commonwealth stresses the scope of the Board members' authority. "Indeed, the jurisdiction of the Appeals Board is broader than that of some of the specialized Article II Federal courts like that of the Court of International Trade. 28 U.S.C. §§ 251, 1581." Appellant's Brief at 19-21. The Commonwealth also stresses that much of the Board's jurisdiction is statutory and thus beyond the reach of the Secretary. "[W]hile it is true that the Secretary can withdraw most of the authority granted to the Appeals Board, she

12

cannot withdraw the Appeals Board's statutory jurisdiction. <u>See</u> 42 U.S.C. § 608(j)". Appellant's Brief at 19-21. Finally, the Commonwealth argues that the tenure of the Board members supports principal officer status. The parties have stipulated that Board members will serve indefinitely unless removed for misconduct. While conceding that the Secretary has the power to remove members, the Commonwealth argues that exclusive reliance on the removal criteria would classify virtually all Executive Branch officials, except the President and his cabinet, as inferior officers.

Defendants contend that the Commonwealth grossly inflates the duties and authority of the Appeals Board.

> Appeals Board review is not available, however, in civil rights cases and matters in which a statute requires a formal hearing under the APA, 5 U.S.C. 554, or some other hearing process. 45 C.F.R. pt. 16, App. A, § F. The Board is also 'bound by all applicable laws and regulations,' 45 C.F.R. 16.14 -- <u>i.e.</u>, it applies, rather than makes, agency policy. <u>See</u> App. 47a (stipulation) (Board members are not in confidential or policy-making positions). The Commonwealth's claim that the Board's authority 'supersedes even that of the Secretary of HHS herself is thus preposterous.

Appellees' Brief at 20-21. Further, defendants point out that "Appeals Board members may be removed by the Secretary for unacceptable performance or cause" and that the Secretary retains discretion to terminate or reassign all but a few of the Appeals Board's functions. Appellees' Brief at 21.

We agree that the Appeals Board members are not principal officers. Like the independent prosecutors in <u>Morrison</u>, the Appeals Board members are subject to removal by a higher

13

Executive Branch official, i.e. the Secretary of HHS.  Although there are some restrictions on the Secretary's ability to remove Board members, the Secretary's ability is not nearly as restricted as that of the Attorney General in Morrison, and the Board members have no statutory authorization to bring a civil action challenging their removal as did the special prosecutor in Morrison.  Furthermore, although the term of service on the Board is not restricted in duration, the Secretary may remove a member for cause or misconduct at any time, and the Board's powers and responsibilities are limited by regulation.  Finally, and perhaps most significantly, the Secretary could altogether eliminate the powers of the Board that are at issue here.

It is true that the Secretary cannot withdraw the Appeals Board's statutory jurisdiction.  See 42 U.S.C. § 608(j) (providing for HHS Appeals Board review of Title IV-A disallowance decisions made by a Quality Control panel).  The Commonwealth relies upon Freytag to argue that if Board members are principal officers for purposes of deciding statutory jurisdiction cases, then they are principal officers for all purposes.  However, reliance on Freytag is misplaced.

There, a statute authorized the Chief Judge of the Tax Court to appoint special trial judges and to assign them four categories of cases.  These categories included: (1) any declaratory judgment proceeding, (2) any proceeding under § 7463 of the Internal Revenue Code, (3) any proceeding in which the deficiency or claimed overpayment did not exceed $10,000, and (4) any other proceeding which the Chief Judge may designate.

14

Freytag, 501 U.S. at 873. In the first three categories, the special trial judge possessed the authority to render a final decision, however, in the fourth category, the special judge could only issue proposed findings and recommend a disposition. The Commissioner of the IRS conceded that the special trial judges were inferior officers for purposes of the first three categories of cases, but argued that the judges were "employees" for the fourth category because the trial judges' duties were significantly curtailed in that category. Id. at 882. The Supreme Court rejected this argument reasoning that:

> [t]he fact that an inferior officer on occasion performs duties that may be performed by an employee not subject to the Appointments Clause does not transform his [or her] status under the Constitution. If a special trial judge is an inferior officer for purposes of [the first three categories of cases], he [or she] is an inferior officer within the meaning of the Appointments Clause and . . . must be properly appointed.

Id. at 882. Similarly we do not believe that the Appeals Board's statutory grant of jurisdiction to review funding disallowances of the Quality Control Board transforms the Board's members into principal officers.

The AFDC program is a public-assistance scheme established by federal statute. See 42 U.S.C. §§ 601-615 (1982). The statutory scheme that gave birth to the AFDC program has been appropriately described as "mind-numbing in complexity." N.Y. State Department of Social Services v. Bowen, 835 F.2d 360, 361 (D.C. Cir. 1987). "Under the program, the federal government makes grants to partially fund eligible state programs that provide cash assistance to low-income families with dependent

15

children."  Commonwealth of Pennsylvania v. United States, 752 F.2d 795, 797 (3d Cir. 1984).  Under section 608(j), the Board has quasi-appellate review over AFDC funding disallowance decisions made by a Quality Control Review Panel.  The quality control system for the program was created to minimize the number and amount of inappropriate payments made under the AFDC program.  See 45 C.F.R. § 205.40(a).  However, while the Board functions as an adjudicatory body under § 608(j), Board members remain subject to removal by the Secretary of HHS.  Moreover, the Board's powers under § 608(j) are strictly limited by the statute and implementing regulations.  See 45 C.F.R. §§ 205.40-205.43.  Accordingly, the Board is powerless to review certain findings of the Quality Control Panel. See 42 U.S.C. § 608(j)(2).  Thus, the authority of the Board as a quasi-appellate body under § 608(j) is even more limited than the authority the Board has when reviewing a Title IV-D disallowance.

Of course, "[t]he nature of each government position must be assessed on its own merits," Silver, 951 F.2d at 1040.  Nevertheless, if special trial judges of the Tax Court are not principal officers under Freytag, it is difficult to imagine how Appeals Board members could be principal officers given the limitations imposed by the foregoing statutory scheme.

> [S]pecial trial judges perform more than ministerial tasks.  They take testimony, conduct trials, rule on the admissibility of evidence, and have the power to enforce compliance with discovery orders.  In the course of carrying out these important functions, the special trial judges exercise significant discretion.

16

<u>Freytag</u>, 501 U.S. at 881-82.  Perhaps even more importantly, a special trial judge has the authority to render a final decision on any of the three specifically described proceedings set forth above.

Congress' grant of authority to the Chief Judge of the Tax Court to appoint special trial judges and assign them the categories of cases described above necessarily includes the concomitant power to remove them and/or to curtail their duties.  As discussed earlier, the same is true here.  Accordingly, we conclude that the Appeals Board members are "inferior officers" for purposes of the Appointments Clause.

This does not, however, end our inquiry under the Appointments Clause.  The Commonwealth argues that even if the Appeals Board members are "inferior officers," their existence is still a violation of the Appointments Clause because no act of Congress specifically authorizes their appointment.  Appellant's Brief at 23.  The defendants contend that the Social Security Act provides the Secretary with the necessary authority.  <u>See</u> 42 U.S.C. § 913.  This section provides, in pertinent part, that:

> the Secretary is authorized to appoint and fix the compensation of such officers and employees and to make such expenditures as may be necessary for carrying out the functions of the Secretary under this chapter.  The Secretary may appoint attorneys and experts without regard to the civil service laws.

42 U.S.C. § 913.[1]  This authorization is consistent with the applicable portion of the Appointments Clause that states: "but

---

[1]    At the time of the district court's decision, this provision was codified at 42 U.S.C. § 903.

17

the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the courts of Law, or in the Heads of Departments."  U.S. Const. Art. II, § 2, cl. 2.  On its face, the language of this "excepting clause" does not require that a law specifically provide for the appointment of a particular inferior officer.  To the contrary, "the Constitution affords Congress substantial discretion to fashion appointments within the specified constraints."  Silver v. United States Postal Service, 951 F.2d 1033, 1037 (9th Cir. 1991); see also Ex Parte Siebold, 100 U.S. 371, 397–98 (1880) ("[A]s the Constitution stands, the selection of the appointment power, as between the functionaries named, is a matter resting in the discretion of Congress."); Morrison, 487 U.S. at 673 (same).

In recognition of the enormous scope of the Secretary's responsibilities, Congress gave the Secretary carte blanche to appoint individuals to assist her in carrying out these duties. See 42 U.S.C. § 913.  We do not believe that this grant of appointment authority runs afoul of the Appointments Clause. "The strict requirements of nomination by the President and confirmation by the Senate were not carried over to the appointment of inferior officers.  A degree of flexibility was thought appropriate in providing for the appointment of officers who, by definition, would have only inferior governmental authority."  Weiss v. United States, 114 S.Ct. 752, 765 (1994) (Souter, J., concurring).  Accountability is ensured and governmental power checked by Congress's assignment of appointing power to the highly accountable head of a federal department like

18

the HHS.  See id. at 765 (Souter, J., concurring) ("the Framers .
. . structured the [appointment of inferior officers] to ensure
accountability and check governmental power: any decision to
dispense with presidential appointment and Senate confirmation is
Congress's to make, not the President's, but Congress's authority
is limited to assigning the appointing power to the highly
accountable President or the heads of departments, or, where
appropriate, to the courts of law."); Freytag, 501 U.S. at 884,
111 S.Ct. at 2631 ("The Framers understood . . . that by limiting
the appointment power, they could ensure that those who wielded
it were accountable to political force and the will of the people
. . . Even with respect to `inferior Officers,' the Clause allows
Congress only limited authority to devolve appointment power on
the President, his heads of departments, and the courts of
law.").

Moreover, requiring Congress to identify the HHS Appeals
Board by name in its statutory grant of authority would be
legislatively unworkable and defeat the purpose of the relaxed
requirements for "inferior officer" appointments.  The Framers of
the Constitution created the classification of "inferior
officers" because they foresaw that "when offices became
numerous, and sudden removals necessary," nomination by the
President and confirmation by the Senate "might become
inconvenient."  United States v. Germaine, 99 U.S. 508, 510
(1879).  The convenience afforded by inferior officer
appointments would hardly be served if we were to require
Congress to account for every potential inferior officer

19

appointment in its statutory grant of authority to the department head.  Here, the highly accountable department head has been given the discretion to fashion inferior officer appointments to fit her needs, and she has done so by appointing members to the HHS Appeals Board.  We hold that, in doing so, she acted within the scope of her authority under 42 U.S.C. § 913.

Notwithstanding this clear congressional grant of appointment authority, the Commonwealth argues that the Secretary of HHS has improperly used her ordinary appointment power to create an extraordinary tribunal.  Appellant's Brief at 24. The Commonwealth claims that the Appeals Board is not directly accountable to the political leadership because: (1) its members are civil service members who serve for life; (2) its members are only indirectly supervised; (3) the members' evaluations have nothing to do with cases before the Appeals Board; and (4) in many categories of cases, the Secretary cannot overturn the Appeals Board's decisions.  Appellant's Brief at 25.

Notwithstanding these considerations, the Appointments Clause does not hint that inferior officers must be as tightly tethered to the appointing entity or political leadership as the Commonwealth suggests.  Neither Morrison nor Freytag suggests that inferior officers must have a certain level of supervision and political accountability in order to survive constitutional scrutiny. To the contrary, in Morrison, the Court specifically stated: "the [Ethics in Government] Act simply does not give the Division the power to `supervise' the independent counsel in the exercise of his or her prosecutorial authority." 487 U.S. at 681.

20

Common sense establishes that supervision and political accountability in the sense used by the Commonwealth are antithetical to the concept of both an independent counsel in Morrison and a judge in Freytag. Requiring a prosecutor to be directly supervised by, and accountable to, the very persons he or she may be charged with investigating and prosecuting would make a mockery of the authority the Supreme Court sought to preserve and ratify in Morrison. Similarly, the concept of supervision and dependence is wholly inconsistent with the notion of a judge in Freytag.

Furthermore, a requirement that an inferior officer be subject to direct supervision of the appointing entity, as the Commonwealth suggests, is at odds with the very test for "officer" status under the Appointments Clause. That clause vests such status in "any appointee exercising significant authority pursuant to the laws of the United States." Freytag, 501 U.S. at 881. It stands to reason that the level of supervision imposed on the appointee and the appointee's authority are inversely related. See United States v. Boeing Co., 9 F.3d 743, 758 (1993) (holding that the authority exercised by qui tam "realtors" or "informers" who bring suit under the False Claims Act is not so "significant" that it must only be exercised by officers appointed in the manner prescribed by the Appointments Clause because the Executive Branch retains "sufficient control" over the realtors).

21

Finally, the Commonwealth's reliance on 5 U.S.C. § 2104(a) is misplaced.[2] This provision merely defines "officer" for purposes of Title 5 of the United States Code, entitled "Government Organization and Employees." See 5 U.S.C. § 2104(a). It has no relevance to "officer" status under the Appointments Clause, and thus, its reference to "supervision" certainly cannot be read to restrict the appointment authority conferred by Article II. Appellees' Brief at 25. Therefore, we hold that the Appointments Clause is not violated because the Secretary's general appointment power under 42 U.S.C. § 913 authorizes the appointment of Appeals Board members.

## B. Civil Service Regulations

The Commonwealth argues that even if the appointment of Appeals Board members was constitutional, their appointment

---

[2] Section 2104, in relevant part, states as follows:
(a) For the purpose of this title, "officer", except as otherwise provided by this section or when specifically modified, means a justice or judge of the United States and an individual who is--
(1) required by law to be appointed in the civil service by one of the following acting in an official capacity--
(A) the President;
(B) a court of the United States;
(C) the head of an Executive agency; or
(D) the Secretary of a military department;
(2) engaged in the performance of a Federal function under authority of law or an Executive act; and
(3) subject to the supervision of an authority named by paragraph (1) of this section, or the Judicial Conference of the United States, while engaged in the performance of the duties of his office.

5 U.S.C. § 2104

violated relevant civil service laws (except for the chairperson whose appointment is not challenged on these grounds). Accordingly, in the Commonwealth's estimation, the Board had no statutory power to act.  Defendants contend that this argument has been waived since the Commonwealth never raised it before the Board.  In addition, defendants argue that the Secretary's decision to appoint excepted service attorneys to the Appeals Board is a matter of nonreviewable agency discretion.

The Supreme Court has held that an issue is nonreviewable only in rare instances "where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." Lincoln v. Vigil, 113 S.Ct. 2024, 2030-31 (1993).  Here, we can examine the relevant statutes and regulations to determine whether they grant the Secretary the appointment authority she utilized.  Moreover, we retain the discretion "to hear issues not raised in earlier proceedings when special circumstances warrant an exception to the general rule" that would otherwise result in a waiver. State of New Jersey Dept. of Ed. v. Hufstedler, 724 F.2d 34, 36 n.1 (3d Cir. 1983).  Such "special circumstances" exist here because the Office of Personnel Management explicitly advised Pennsylvania that non-SES Appeals Board positions were "in competitive service."  (App. at 13a).  The Commonwealth learned that OPM's statement was erroneous only after suit was filed in the district court.  Accordingly, it would be inappropriate to allow the Commonwealth's reliance on the OPM's erroneous information to prejudice the Commonwealth to the extent of not now considering

23

the merits of its position.  Thus, we will reach the merits of the Commonwealth's position.

"Civil service" is defined as all Federal appointive positions except uniformed services.  5 U.S.C. § 2101.  The civil service is composed of the "competitive service," the "excepted service," and the "senior Executive Service."  See 5 U.S.C. §§2102, 2103.  All Executive Branch appointive positions not requiring Senate confirmation and not in the Senior Executive Service are to be in the competitive service unless "specifically excepted from the competitive service by or under statute."  5 U.S.C. § 2102.  Congress authorized the President, when warranted by "conditions of good administration," to make "necessary exceptions of positions from the competitive service" within the executive branch.  5 U.S.C. § 3302.  Subsequently, the President delegated this authority to the Office of Personnel Management (OPM).  Exec.Order No. 10577, 5 C.F.R. § 6.1(a).  OPM thereafter divided excepted service positions into three categories: Schedules A, B, and C.  5 C.F.R. § 6.2.  Schedule A, which allows exception of "positions other than those of a confidential or policy-determining character for which it is impracticable to examine," 5 C.F.R. § 213.3101, specifically includes "attorneys." 5 C.F.R. § 213.3102(d).  Here, the parties have stipulated that the Schedule A "attorney appointment" authority was utilized to appoint the challenged members of the Appeals Board. Accordingly, the essential dispute is straightforward.

In effect, defendants contend that Schedule A specifically provides for the appointment of "attorneys" to the Appeals Board

24

without regard to the competitive service requirements of the civil service laws. The Commonwealth disagrees. It believes that members of the Appeals Board cannot be hired pursuant to the "attorney appointment" power of Schedule A since, in reality, these attorneys function as administrative law judges. See Appellant's Brief at 28-30. For the following reasons, we cannot agree with the Commonwealth.

Schedule A imposes two limitations on the "attorney appointment" authority. Under the OPM regulation, such authority is limited to "positions other than those of a confidential or policy-determining character for which it is impracticable to examine." 5 C.F.R. §§ 213.3101. Here, the Commonwealth does not question the OPM's determination that "attorneys" may be appointed under Schedule A authority. Rather, the Commonwealth challenges the Board members' designation as "attorneys." Accordingly, we must return to the function of the Board.

The Appeals Board reviews final written decisions in a narrowly specified range of disputes arising from HHS programs. See 45 C.F.R. Pt. 16, App. A. In resolving these disputes, Board members are authorized to engage in diverse legal and quasi-judicial tasks. Some of these tasks include examining witnesses and evidence, holding hearings and informal conferences, assisting parties to submit relevant information and to rule on requests and motions. See 45 C.F.R. § 16.13. However, contrary to the Commonwealth's assertions, no authority exists for the proposition that Appeals Board members function as administrative law judges. Congress granted administrative law judges ("ALJ")

25

the authority to conduct formal hearings in accordance with sections 556 and 557 of the Administrative Procedure Act, ("APA").[3]  By contrast, the Appeals Board has no authority to review any dispute for which a formal hearing is required under the APA.  45 C.F.R. Pt. 16, App. A, § F.  Instead, the Board provides a mechanism for reviewing the category of HHS disputes not otherwise designated by Congress for formal adjudication pursuant to either 5 U.S.C. § 554, Title VII or some other statutory scheme.  Id.  Accordingly, we must reject any attempt to analogize the Board members to administrative law judges.

We believe the Schedule A "attorney appointment" power clearly extends to the challenged members of the Appeals Board. Nothing in the relevant statutory or regulatory scheme restricts the Secretary's appointment of attorneys, under Schedule A, to perform the tasks assigned to the Appeals Board.  Title 5 U.S.C. § 3106 merely restricts the employment of "an attorney or counsel for the conduct of litigation."  Since 5 C.F.R. § 213.3102(d) specifically exempts the challenged members from the competitive service requirements of the civil service laws, we conclude that the Board was not divested of its authority to act.

Accordingly, we affirm the district court's holding that the Secretary's appointment of excepted service attorneys to the

_____

[3]  5 U.S.C. § 3105.  The hearing sections of the APA, 5 U.S.C. §556-557, are applicable, with exceptions, when a rule is required by statute to be made on the record after an agency hearing; when an adjudication is required by statute to be determined on the record after an agency hearing; or when the requirement of a hearing is read into a statute to preserve its constitutionality.

Appeals Board did not run afoul of civil service statutes and regulations.

## E. Program Income

The Commonwealth contends that even if the Appeals Board members were lawfully appointed, the Board and the district court erred in finding that the JCP fee is "program income" which must be excluded from reimbursement under 42 U.S.C. § 655(a)(1).

Section 655(a)(1) provides, in pertinent part, that:
> In determining the total amounts expended by any State during a quarter, for purposes of this subsection, there shall be excluded an amount equal to the total of any fees collected or other income resulting from services provided under the plan approved under this part.

The Commonwealth claims that the phrase "resulting from services provided under the plan approved under this part" is ambiguous.

Appellant's Brief at 31.
> One possible reading of the "resulting from" language is that it qualifies both "fees collected" and "other income."  A second possible reading of the language applies the doctrine of the last antecedent to limit the "resulting from" language so that it qualifies only the "other income" prong of § 655(a).

Id.

HHS has promulgated 45 C.F.R. § 304.50, entitled "Treatment of Program Income."  That regulation states:

> The IV-D agency must exclude from its quarterly expenditure claims an amount equal to:
>
> (a) All fees which are collected during the quarter under the Title IV-D State Plan; and

27

> (b) All interest and other income earned during the quarter resulting from services provided under the Title IV-D plan.

45 C.F.R. § 304.50. The Appeals Board construed the regulation as restating the statute's requirement. The Board reasoned that, "[i]n order to be collected under the plan, fees must necessarily be collected from services provided under the plan." Appeals Board Decision p. 6. Thus, in its estimation, the proper focus is on the receipt of income from grant related activities, not on how the funds are spent. Moreover, the Board suggested that "the underlying reason for this appeal appears to be the IV-D agency's frustration with the fact that the income from the fees is not available for use for IV-D program purposes, yet treating the fees as [program] income reduces the amount of [federal financial participation] available." Appeals Board Decision p. 5 n.4 The Commonwealth accurately describes this practical problem that results from the Board's interpretation of "program income." However, as the Board appropriately noted, "[t]his problem results from the Commonwealth of Pennsylvania's own action of earmarking the funds for JCP purposes. . .and could be remedied by state legislative action." Id. The district court found the Board's construction of 45 C.F.R. § 304.50 and 42 U.S.C. §655(a)(1) to be reasonable and therefore entitled to deference.

The parties dispute the extent to which the Appeals Board's construction of 42 U.S.C. § 655(a) and 45 C.F.R. § 304.50 is entitled to deference. The defendants, citing Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837

(1984) and <u>Thomas Jefferson Univ. v. Shalala</u>, 114 S. Ct. 2381, 2386 (1994), claim we owe deference to an administrative agency's construction of a statute and its implementing regulations. The Commonwealth cites to cases holding that when a Board functions as an adjudicatory tribunal and does not make rules or formulate policy, its interpretation is not entitled to any special deference. <u>See</u> <u>Martin v. Occupational Safety & Health Review Commission</u>, 499 U.S. 144 (1991) (reviewing court should defer to Secretary of Labor when Secretary and Board furnish reasonable but conflicting interpretations of ambiguous regulation promulgated by the Secretary under the Occupational Safety and Health Act); <u>Sharondale Corp. v. Ross</u>, 42 F.3d 993 (6th Cir. 1994) (Department of Labor Benefits Review Board acts as adjudicatory tribunal and does not make rules or formulate policy, and thus its interpretation of regulation is not entitled to any special deference). We need not decide the level of deference owed to an HHS Appeals Board decision, because the Board's interpretation of 45 C.F.R. § 304.50(a) and 42 U.S.C. §655(a)(1), withstands even plenary review.

Section 655(a)(1) is clear on its face. However, to the extent the regulation detracts from the clear import of this statute, the statute must, of course, prevail. <u>See</u> <u>McComb v. Wambaugh</u>, 934 F.2d 474, 481 (3d Cir. 1991) ("[I]n any conflict between a statute and a regulation purporting to implement the statutes provision, the regulation must, of course, give way."); <u>60 Key Centre, Inc. v. Administrator of General Services Admin.</u>, 47 F.3d 55, 58 (2d Cir. 1995) ("When . . . a regulation operates

to create a rule out of harmony with the statute under which it is promulgated, the regulation is considered a nullity."). However, even if the regulation here has unintentionally clouded an otherwise unambiguous statute, we do not believe that the statute and regulation conflict. See LaVallee Northside Civic Assoc. v. Virgin Islands Coastal Zone Management Commission, 866 F.2d 616 (3d Cir. 1989) (before disregarding a regulation a court must first attempt to reconcile a seemingly discordant statute and regulation). As the Appeals Board reasoned, fees "collected . . . under the Title IV-D plan" must necessarily "result from services provided under the [Title IV-D] plan." Appeals Board Decision at 6. Therefore, under both the statute and the regulation, funds which would not have been generated absent a state's Title IV-D services constitute "program income" not subject to federal reimbursement.

Here, the JCP fee is directly generated by IV-D services. The Commonwealth collects an extra $5 from either the parent requesting the IV-D services or the parent legally obligated to pay IV-D child support when such a case is filed. This fact is not negated merely because the Commonwealth itself has chosen to use the JCP fee in a manner that does not enhance the Child Support Enforcement program in Pennsylvania. Clearly, the Commonwealth may allocate income derived from the JCP fee in any manner it chooses. However, under this statutory scheme, its decision as to how to utilize the income from the fee has no bearing on federal reimbursement for Title IV-D services.

30

The Commonwealth raises an additional argument, relying on 45 C.F.R. § 74.41(c). That regulation pre-dated 42 U.S.C. §655(a)(1). When the district court granted summary judgment for the defendants, §74.41(c) (which governs all HHS grant programs) provided, in pertinent part, that:

The following shall not be considered program income:

(1) Revenues raised by a government recipient under its governing powers, such as taxes, special assessments, levies and fines . . .

45 C.F.R. § 74.41(c). The Commonwealth contends that the JCP fee is a "special assessment" within the meaning of § 74.41(c)(1) and therefore need not be considered program income. However, §74.41(c)(1) does not apply when it is "inconsistent with Federal statutes [or] regulations." 45 C.F.R. § 74.4(a). Since we uphold the Board's interpretation of 45 C.F.R. § 304.50(a) and 42 U.S.C. § 655(a)(1), § 74.41(c)(1) is inapplicable here because it directly conflicts with § 304.50(a) and § 655(a)(1).

Accordingly, we affirm the district court's conclusion that the JCP fee is program income as defined by 42 U.S.C. § 655(a)(1) and 45 C.F.R. § 304.50(a), and thus, may not be reimbursed with federal funds.

## F. New Evidence

The Commonwealth's final contention is that we should "remand so that the Appeals Board can consider new evidence uncovered in HHS's belated response to the Commonwealth's Freedom of Information Act ("FOIA") request." Appellant's Brief at 36.

31

We will treat the Commonwealth's motion for a remand to the Appeals Board as a motion for a new trial based on newly discovered evidence, and therefore, review the district court's denial of the Commonwealth's motion for an abuse of discretion. See Dunn v. Hovic, 1 F.3d 1362, 1364 (3d Cir.), cert. denied, U.S. ___, 114 S.Ct. 650 (1993) (motion for new trial reviewed for an abuse of discretion). The purported new evidence is a 1988 policy memorandum (PIQ-88-5) issued by HHS' Office of Child Support Enforcement. The memorandum states that interest earned by North Carolina county courts on child support collections, before being forwarded to the state's IV-D agency, is not program income because the county courts are not under cooperative agreements with the State IV-D agency, and thus, are not bound by state and federal IV-D regulations.

The district court denied the remand motion because "PIQ-88-5 can be distinguished from the facts presented here, as DPW administers its Title IV-D program through cooperative agreements with all of Pennsylvania's judicial districts, and the JCP fee is collected by the Pennsylvania Domestic Relations Section of the Court of Common Pleas." We agree. The Commonwealth also suggests that a previously undisclosed 1989 Federal Register statement is new evidence that warrants a remand. However, by definition, a Federal Register notice is public. We are at a loss to understand how such public information should be viewed as "new evidence" justifying a remand merely because the Commonwealth's initial research apparently somehow failed to find it.

32

The district court acted well within its discretion in refusing to remand this case to the Appeals Board.  PIQ memoranda are fact-specific policy documents, not intended to apply broadly, and are due less weight than regulations.  Simply stated, they are not binding precedent on the Appeals Board.  Finally, even if PIQ-88-5 had some precedential value, we agree with the district court's conclusion that the case before us is distinct and the memorandum was, therefore, of little value to the Appeals Board.

Accordingly, we affirm the district court's denial of the Commonwealth's motion for a remand to the Appeals Board.

## III.

For the foregoing reasons, the judgment of the district court will be affirmed.