Steven **LOCKERT**, Petitioner,

v.

**UNITED STATES DEPARTMENT OF LABOR, Ann McLaughlin, Secretary of Labor, Respondent,**

and

**Pullman Power Products Corporation, Respondent–Intervenor.**

No. 87–7550.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 16, 1988.

Decided Jan. 30, 1989.

Thomas Devine, Washington, D.C., for petitioner.

Ford N. Newman, Dept. of Labor, Washington, D.C., for respondent.

Richard R. Boisseau, Atlanta, Ga., for respondent-intervenor.

Before FLETCHER and BEEZER, Circuit Judges, and KING,* District Judge.

FLETCHER, Circuit Judge:

This case involves the discharge of Steven Lockert, a Quality Control Inspector at a nuclear power plant operated by Pullman Power Products Corp. Lockert claims that he was terminated in violation of the Energy Reorganization Act of 1974, which protects employees who assist or participate in actions to carry out the purposes of the federal statutes regulating the nuclear energy industry. The ALJ and the Secretary of Labor concluded that Lockert was not terminated because of his safety-related activities and that the Act's "whistleblower" protection does not apply. We affirm.

I

Lockert was a Quality Control Inspector (QCI) at the Diablo Canyon Nuclear Power Plant in California between July 25, 1983 and December 15, 1983. In essence, Lockert argues that he was a diligent quality control inspector who was fired for doing his job too conscientiously. The Secretary

* Hon. Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation.

and Pullman argue that Lockert was terminated because he twice left his assigned work area without permission in violation of Pullman's rules for employees.

The "chain of command" at Diablo Canyon apparently was as follows. Jim Cunningham, a QCI leadman, was Lockert's immediate supervisor. Jeff Charbaneau and Russel Nolle were both QCI supervisors, although Nolle apparently had greater authority. Nolle reported to Harold Karner, the Field Quality Control Manager. Karner testified that he alone had the authority to approve a termination.

During his employment at Diablo Canyon, Lockert reported to Pullman a large number of "discrepancies" between the applicable safety standards and actual conditions. However, Karner testified that the number and seriousness of Lockert's reports were not unusual, and that they did not result in any unusual expenses for Pullman. Pullman also offered an Exhibit showing that 18 QCIs submitted more deficiency condition notices (DCNs) than Lockert during his term of employment. There is no evidence in the record contradicting Karner's statement.[1]

Much of the evidence in the record concerns the events of October 17, 1983 and December 14, 1983. On October 17, 1983, Lockert had an argument with Nolle. Lockert explained that prior to October 17 he discovered that Pullman's field manual did not contain any criteria for rejecting defective bolts. According to Lockert, Lockert went to the QC office in order to research the industry codes for rejection criteria. At the QC office, Nolle told Lockert that he should no longer consult industry codes. Lockert responded that this limitation was unacceptable, since the field manual did not cover the situation at hand. At that point, Nolle became "visibly agitated," pointed to his neck, and said that he and Karner had "had it up to here" and "that you have just

one foot out the door, Mr. Lockert, one more wrong move and you are gone."

Nolle's account of the October 17th incident is substantially different. Karner testified that he ran into Nolle that day, asked why Lockert was in the QC office, and reminded Nolle about the calls they had received about the lack of QCI coverage. Nolle testified that, at the QC office, he asked Lockert what he was doing there. Nolle claimed that Lockert admitted that he had already rejected the bolts and that he did not have permission to be away from his work area.

Nolle testified that he then forbade Lockert from copying the industry codes, but that he never told Lockert that he was not to consult them. He also admitted to warning Lockert that he had one foot out the door, but claimed that this outburst was directed at Lockert's absence from his work area without permission, and not his researching of the codes per se.

On cross-examination, Lockert apparently contradicted his earlier testimony by answering "yes" to the question, "at the time Mr. Nolle spoke to you, had you already rejected the bolts?"

On December 14, 1983, Lockert left his work area for somewhere between two and three hours. Lockert testified that he received permission from Cunningham to "perform updates on the DCN, perform the STPR ["Steps to Prevent Recurrence"] training, reinspection and I believe I termed it, catch up on other work." Lockert claimed that Cunningham gave him no specific time limit. Cunningham admitted giving Lockert permission and setting no time limit, but claimed that Lockert told him he was planning only to work on two STPRs. Cunningham claimed that those tasks should have taken only half an hour. QCI Achtenberg testified that he heard Lockert ask Cunningham for permission to complete a DCN update and a STPR, tasks which (according to Achtenberg) would

---

1. In his brief, Lockert argues that the discrepancy he reported just prior to his discharge could have had a disastrous effect on Pullman since the nuclear plant was on the verge of a Nuclear Regulatory Commission licensing vote. Nothing in the record suggests this disastrous effect.

Lockert states that the ALJ did not allow him to introduce evidence that would have shown this disastrous effect. However, since Lockert does not argue that the ALJ erred in excluding evidence, we must accept the record as is.

take at most 1½ hours. Cunningham and QC leadman supervisor Joe Watson testified that Joe Watson called Cunningham several times that morning to complain about Lockert's absence from his assigned work area. Cunningham testified that he ran into Lockert at 7:45 that morning and told him to "wrap-up" the STPRs and return to his work area. Lockert denied that he ever saw Cunningham after he received permission to leave his work area.

On December 15, 1983, Lockert was discharged. It is unclear from the record who prepared the termination notice, but Karner claimed that he approved the termination based on Nolle's recommendation. Nolle (who was absent on the 14th) testified that he based his decision on reports from Joe Watson, Jeff Charbaneau, and Cunningham. The termination notice discusses only Lockert's absence from his work area on December 14. Nolle admitted that the termination was also a response to the fact that Lockert had violated the work area rule and received an explicit warning on October 17. Karner testified that, to his knowledge, no other QCI has ever been absent from his work area without permission for as many hours as Lockert. Nolle and Karner testified that the termination was not in retaliation for Lockert's safety-related activities and complaints.

Several of Lockert's witnesses reported that Pullman employees had made disparaging remarks about Lockert's safety-related activities and complaints. However, with the exception of Nolle, none of these employees were involved in the decision to discharge Lockert. QCI Achtenberg testified that he observed Nolle in October or November with a memo from Lockert and that Nolle then made the comment that Lockert is a "pain in the ass." However, Lockert never established the subject of that memo. Moreover, Nolle testified that he called all the QCIs a "pain in the ass," and Achtenberg confirmed that Nolle referred "to a lot of people" that way (including Achtenberg).

On January 9, 1984, Lockert filed a complaint with the Department of Labor. On October 5, 1984, the ALJ filed a recommended decision and order recommending that Lockert's complaint be dismissed with prejudice. In her first decision in this case, the Secretary found that the ALJ had wrongly based his decision on the premise that internal safety complaints are not protected activity and "apparently because of his narrow view of the scope of protected activities under the Act" had given perfunctory attention to Lockert's evidence. The Secretary accordingly remanded. On remand, the ALJ again concluded that Lockert's complaint should be dismissed with prejudice. In her second decision in this case, the Secretary adopted the ALJ's recommendation.

The ALJ's second decision recognized that there was "conflicting circumstantial evidence," but concluded that Nolle and Karner terminated Lockert for the sole reason given. The ALJ explained that Nolle and Karner were credible witnesses, and that a decision cannot be determined by the number of witnesses, "but on the quality and credibility of any one or a number of witnesses." The ALJ also pointed to the fact that Lockert was recommended for a merit pay increase in early December, 1983, as circumstantial evidence that his discharge was not due to any prior disagreements regarding Lockert's criticisms of safety conditions. The Secretary's second decision similarly recognized that there was some evidence of retaliatory motive, but concluded that there was sufficient evidence to rebut an inference of retaliatory motive.

We have jurisdiction pursuant to 42 U.S.C. § 5851(b), which provides that any person adversely affected by an order of the Secretary may obtain review in the court of appeals for the circuit in which the violation of the Energy Reorganization Act allegedly occurred.

## II

The Secretary's decision is reviewed under the Administrative Procedure Act, 5 U.S.C. § 706. The Secretary's decision must therefore be set aside if it is unsupported by substantial evidence or if it is

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. *See Mackowiak v. University Nuclear Systems, Inc.*, 735 F.2d 1159, 1162 (9th Cir.1984) (setting forth standard of review for § 5851 cases).

### III

Lockert first argues that the ALJ's and Secretary's discussion of the evidence he presented is inadequate. In particular, Lockert relies on the "law of the case" doctrine to argue that the ALJ's second opinion must be rejected inasmuch as it failed to follow the remand instructions in the Secretary's first opinion.

■ The Administrative Procedure Act requires agency decisions to include "findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law or discretion presented on the record...." 5 U.S.C. § 557(c)(3)(A). "An agency is not required, however, to furnish detailed reasons for its decision. The decision must simply be 'sufficiently clear so that a court is not required to speculate as to its basis.'" *Lodi Truck Service, Inc. v. United States*, 706 F.2d 898, 901 (9th Cir. 1983) (citation omitted). In this case, we are not forced to speculate as to the basis of the Secretary's decision. The Secretary specifically relied on the testimony of Pullman's witnesses and the ALJ's findings regarding the credibility of these witnesses. In particular, he noted testimony to the effect that Lockert's safety complaints were not unusual, that Pullman had a clear rule against leaving one's work area without permission, that Lockert was warned not to violate this rule on October 17, that Lockert had been absent for three days around Thanksgiving of 1983 without calling in to work, and that his discharge was a response to his absence from his work area without permission on December 14. The Secretary also noted that Lockert admitted that he had no permission to leave his work area on October 17, 1983, and that "[t]he managers and supervisors, other than Mr. Nolle, who made disparaging remarks about [Lockert] were not involved in the decision to fire him."

■ We are also unpersuaded by Lockert's reliance on law of the case doctrine. Lockert argues that, under the law of the case doctrine, the Secretary is "bound" by her finding that the ALJ's analysis of Lockert's evidence in his first decision is "perfunctory" and thus unacceptable. Since the ALJ did not substantially expand upon that analysis in his second decision, Lockert contends, the Secretary is estopped from "accepting" the ALJ's second decision.

In *Containerfreight Transportation Co. v. I.C.C.*, 651 F.2d 668 (9th Cir.1981), we rejected a "law of the case" argument similar to that put forward by Lockert:

Petitioners appear to suggest that the Commission's remand order established in some fashion the law of the case, and that the Commission was therefore obliged to make its final disposition on the basis of the issues framed in the remand order. We do not accept this view. The commission has broad discretion to remand for further findings even if those findings may ultimately prove irrelevant. At most, petitioner's argument tends to show that the remand order was ill conceived. Even if this were so, there was no prejudice to petitioners except the inconvenience of a second hearing. A mistake of this kind, if indeed it was a mistake, would not justify invalidating an ICC order otherwise supported by substantial evidence.

*Id.* at 671.

The court in *Containerfreight* reasoned that the ICC's remand order had no binding effect on the Commission since the Commission has "broad discretion to remand for further findings." Nothing in the Energy Reorganization Act or the accompanying regulations suggests that the Secretary's remand discretion is not similarly broad. *See* 42 U.S.C. § 5851; 29 C.F.R. § 24.6 (providing that the ALJ must forward his recommended decision and the record to the Secretary and that the recommended decision "shall contain appropriate findings").

There is apparently no authority applying the law of the case doctrine to an

administrative proceeding. This in not surprising, since it is doubtful that federal courts have the authority to extend the law of the case doctrine to proceedings involving non-judicial decisionmakers, such as the ALJ and the Secretary. Law of the case doctrine is purely judge-made; in the absence of statutory guidance, it makes sense for judges to develop doctrines to help manage efficiently their own affairs. *See* 18 Wright, Miller & Cooper, Federal Practice and Procedure, § 4478, at 788 (1981) ("Law of the case rules.... regulate judicial activity before final judgment."). The basis for extending this doctrine beyond "judicial affairs," however, is far from certain.

## IV

Lockert next argues that his termination was improper because it was based on his conducting industry code research on October 17. He argues that, since that activity was protected, his termination violated § 5851.

The ALJ never addressed this issue. The Secretary's position in her second decision seems to be that, although code research may be protected under certain circumstances, an employer has the right to condition such research on the employee's obtaining permission from his supervisor. Our review of the Secretary's decision regarding the scope of "protected activity" is deferential. *See, e.g., Ad Art, Inc. v. NLRB*, 645 F.2d 669, 679 (9th Cir.1980) ("The line between an employer's right to maintain order and the employee's right to engage in protected conduct must initially be drawn by the Board.").

There is apparently no case law on the issue of industry code research. Lockert argues that his research was in effect authorized by 10 C.F.R. 50, Appendix B, Criteria I and V. Criterion I states in part that the "persons and organizations performing quality assurance functions shall have sufficient authority and organizational freedom to identify quality problems." Criterion V states in part that "[a]ctivities affecting quality shall be prescribed by documented instructions.... Instructions ... shall include appropriate quantitative or qualitative acceptance criteria for determining that important activities have been satisfactorily accomplished." Lockert contends that, since Pullman failed to provide him with acceptance criteria for bolts as required by Criterion V, Pullman was obligated under Criterion I to give him access to the industry code information necessary to determine whether there was a quality problem. In *Mackowiak*, this court held that § 5851 "protects quality control inspectors from retaliation based on internal safety and quality control complaints." 735 F.2d at 1163. The court noted § 5851's "broad remedial purpose of protecting workers from retaliation from their concerns for safety and quality," *id.* at 1163, and accordingly suggested that an inspector's efforts to obtain information needed to identify quality problems is protected:

> On December 10, 1982 [Mackowiak] filed Request for Information No. 433 regarding possible falsification of rod control documentation.... Other incidents ... arguably do merit protection. As an example, Request for Information No. 433 seems to have been a legitimate part of his duties as a quality control inspector.

*Id.* at 1161, 1164.

*Mackowiak*, however, does not suggest that an employee is free to choose the precise manner in which to seek necessary information. A rule requiring permission from a supervisor is not on its face unreasonable. Pullman officials offered a plausible business reason for this rule: Pullman's need to ensure adequate QCI coverage so that the craft workers could continue their production work. Lockert never presented evidence that he requested permission on October 17, that he believed that a request would have been futile, or that a request in fact would have been futile. In the absence of such evidence, we cannot hold that the Secretary erred in finding that Lockert was not engaged in protected activity when he left his work area without permission on October 17.

## V

■ Lockert also argues that the ALJ's and the Secretary's decisions are not supported by substantial evidence. Under § 5851, an employer may discharge an employee who has engaged in protected conduct as long as the employer's decision to discharge the employee is not motivated by retaliatory animus and the employer has reasonable grounds for the discharge. *See Consolidated Edison Co. of New York, Inc. v. Donovan,* 673 F.2d 61, 64 (2d Cir. 1982) (upholding an ALJ's finding of a § 5851 violation in part because the employer's investigation of the employee's alleged misconduct was "grossly inadequate to support the sanction of dismissal"); *Jones v. Flagship International,* 793 F.2d 714, 729 & n. 17 (5th Cir.1986) (employer may discharge an employee who has engaged in protected conduct under Title VII only if the employer has "reasonable grounds" to believe that the employee is guilty of misconduct); *Dickerson v. Metropolitan Dade County,* 659 F.2d 574, 581 (5th Cir.1981) (same). *Compare NLRB v. Burnup & Sims, Inc.,* 379 U.S. 21, 23, 85 S.Ct. 171, 173, 13 L.Ed.2d 1 (1961) (noting that "[a] protected activity acquires a precarious status if innocent employees can be discharged while engaging in it, even though the employer acts in good faith," court held that an employer violates Section 8(a)(1) of the National Labor Relations Act when it discharges an employee who

has engaged in protected activity on the basis of unfounded charges of misconduct).

■ The ALJ's and Secretary's findings that Lockert's discharge was not motivated by retaliatory animus are supported by substantial evidence.[2] In reaching the conclusion that Lockert's discharge was not motivated by retaliatory animus, the ALJ and the Secretary relied on the ALJ's finding that Nolle and Karner were credible witnesses. We will uphold an ALJ's credibility findings unless they are "inherently incredible or patently unreasonable." *Photo–Sonics, Inc. v. NLRB,* 678 F.2d 121, 123 (9th Cir.1982) (citations omitted). *See also Dohmen–Ramirez v. Commodity Futures Trading Commission,* 837 F.2d 847, 856 (9th Cir.1988) (same); *Local 512, Warehouse & Office Workers' Union v. NLRB,* 795 F.2d 705, 712 (9th Cir.1986) (same): *NLRB v. Auto Fast Freight, Inc.,* 793 F.2d 1126, 1131 (9th Cir.1986) (same). In addition, Lockert admitted that he left his work area without permission on October 17, and on cross-examination, contradicted his earlier statement about his rejection of the bolts. Moreover, two of his own witnesses testified that there was a company rule against leaving one's work area without permission. Finally, Lockert failed to submit any evidence establishing that he had made an unusually large or unusually serious number of safety complaints.

Although the question is close, we also hold that the ALJ's and Secretary's findings that Pullman had reasonable grounds

---

**2.** Contrary to Lockert's suggestion, the burden of proof on this issue has not shifted to Pullman. In *Mackowiak v. University Nuclear Systems, Inc.,* 735 F.2d 1159, 1164 (9th Cir.1984), we concluded that "[i]t makes sense to allocate the burden of proof" in accord with *Mt. Healthy. See also Consolidated Edison Co. of New York, Inc. v. Donovan,* 673 F.2d 61, 62 (2d Cir.1982) (in § 5851 cases, "[o]ur view is that we should adopt the rule enunciated in the *Mt. Healthy* case"). Under *Mt. Healthy,* the employee has an initial burden of proving by a preponderance of the evidence that retaliation for protected conduct "played some role" in the termination decision. The burden then shifts to the employer. The employer must show that the employee would have been terminated even if the employee had not engaged in the protected conduct. As the Secretary concedes, there is language in the ALJ's decision suggesting that Lockert had

met his burden of showing that retaliation was one of the motivations for his termination and that the burden had accordingly shifted to Pullman. However, the Secretary in her second decision in this case stated that "[c]omplainant has not carried his burden of proving by a preponderance of the evidence that retaliation for protected activities was a motivating factor in respondent's decision to fire him." Since we "defer to the inferences that the Secretary derives from the evidence, not to those of the ALJ," *Mackowiak,* 735 F.2d at 1162, the relevant evidentiary question is whether substantial evidence supported the Secretary's conclusion that Lockert had not met his burden. *See also NLRB v. Brooks Camera, Inc.,* 691 F.2d 912, 915 (9th Cir.1982) (deference to the Board is appropriate where "the central issue is the employer's motive behind an employee discharge").

for discharging Lockert are supported by substantial evidence.[3] It is debatable whether Pullman had reasonable grounds for believing that Lockert was responsible for his absence from his work area on December 14. Pullman's officials made some effort to investigate the events of December 14. Karner testified that he based his decision to discharge Lockert on Nolle's recommendation. Nolle, in turn, testified that he consulted Joe Watson, Jim Cunningham, and Jeff Charbaneau before making this recommendation. However, Cunningham has never claimed that he gave Lockert a specific time limit on the morning of December 14, and the ALJ found Cunningham's testimony unbelievable with respect to his efforts to locate Lockert after Lockert left his assigned work area. In reviewing an agency's decision for substantial evidence, a court may not displace the agency's " 'choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.*' " *NLRB v. Walton Manufacturing Co.*, 369 U.S. 404, 405, 82 S.Ct. 853, 854, 7 L.Ed.2d 829 (1962) (citation omitted). *See also Consolo v. Federal Maritime Commission*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) (citation omitted) (defining "substantial evidence" as evidence " 'a reasonable mind might accept as adequate' "). Since our review of the ALJ's and Secretary's factual findings is deferential, we affirm their findings that Pullman had reasonable grounds for discharging Lockert.

---

**3.** The ALJ recognized that an employer must have a "legitimate" or "valid" reason for discharging an employee who has engaged in protected conduct, ALJ's Second Decision 8. He explicitly credited Nolle's and Karner's testimony as reliable and thus implicitly found that Pullman had met this requirement when he dismissed Lockert's complaint.