C.D. VARNADORE, Petitioner,

v.

SECRETARY OF LABOR, Respondent,

Lockheed Martin Energy Systems,
Inc., et al., Intervenors.

Nos. 96–3888, 96–4389.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 29, 1998.

Decided April 6, 1998.

Rehearing and Suggestion for Rehearing
En Banc Denied June 19, 1998.

Edward A. Slavin, Jr. (argued and briefed), Deerfield Beach, FL, for Petitioner.

Allen H. Feldman, Judith D. Heimlich, Nathaniel I. Spiller, U.S. Dept. of Labor, Office of the Solicitor, Washington, DC, Marleigh D. Dover, Christine N. Kohl (argued and briefed), U.S. Department of Justice, Civil Division, Appellate Staff, Washington, DC, for Respondent in No. 96–4389.

Allen H. Feldman, Judith D. Heimlich, Nathaniel I. Spiller, U.S. Dept. of Labor, Office of the Solicitor, Washington, DC, Marleigh D. Dover (briefed), Christine N. Kohl (argued and briefed), U.S. Department of Justice, Civil Division, Appellate Staff, Washington, DC, for Respondent in No. 96–3888.

E.H. Rayson (argued and briefed), John B. Rayson (briefed), John C. Burgin, Jr., Kramer, Rayson, Leake, Rodgers & Morgan, Knoxville, TN, G. Wilson Horde, Jr. (briefed), Patricia McNutt (briefed), Oak Ridge, TN, for Intervenor in No. 96–4389.

E.H. Rayson (argued and briefed), John B. Rayson (briefed), John C. Burgin, Jr. (briefed), Kramer, Rayson, Leake, Rodgers & Morgan, Knoxville, TN, G. Wilson Horde, Jr. (briefed), Patricia McNutt (briefed), Lockheed Martin Energy Systems, Inc., Oak Ridge, TN, for Intervenor in No 96–3888.

Before: RYAN and SILER, Circuit Judges; HOOD, District Judge.*

## OPINION

RYAN, Circuit Judge.

Following what C.D. "Bud" Varnadore considered to be various acts of retaliation for protected activity during the course of his employment at Oak Ridge National Laboratory, he filed three complaints with the Secretary of Labor under the whistleblower provisions of seven environmental statutes: the Clean Air Act, 42 U.S.C. § 7622(b); the Toxic Substances Control Act, 15 U.S.C. § 2622(b); the Safe Drinking Water Act of 1974, 42 U.S.C. § 300j–9(i)(2); the Federal Water Pollution Control Act, 33 U.S.C. § 1367(b); the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9610(b); the Energy Reorganization Act of 1974, 42 U.S.C. § 5851(b); and the Solid Waste Disposal Act, 42 U.S.C. § 6971(b). The Secretary concluded that Varnadore's first complaint was time-barred; then, a newly created entity called the Administrative Review Board concluded that Varnadore's second and third complaints were not valid for various reasons.

In this appeal, Varnadore raises two issues. First, he argues that the Secretary erred in concluding his complaint was time-barred, and claims the Secretary wrongly decided that the only complained-of act occurring within the statutorily determined 30–day period was not a retaliatory act. He also argues that the Secretary acted unconstitutionally in creating the Administrative Review Board and delegating his decisionmaking authority for this case to the board.

For the reasons that follow, we will affirm.

### I.

Varnadore was hired to work in the Analytical Chemistry Division of Oak Ridge National Laboratory in Oak Ridge, Tennessee, in 1985; ORNL "is one of the world's largest and most diverse centers for basic and applied scientific research and technology development." During the period in question, Varnadore's employer was Martin Marietta Energy Systems, Inc., a wholly owned subsidiary of the Martin Marietta Corporation. The current employer at ORNL, however, is Lockheed Martin Energy Systems, Inc.

There are two events in Varnadore's employment history at ORNL that the ALJ found constituted protected activity: an incident in 1985 when he told his supervisor that, due to a vision problem, he was unable to use some mechanical hands to manipulate contaminated material without spilling it, and an incident in 1989 when he complained about a coworker's handling of contaminated soil samples. The particulars of neither incident are relevant to the issues in this appeal;

---

* The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

what is important is that it has been determined that Varnadore engaged in protected activity, and, therefore, he has established that element of his *prima facie* case.

Further, Varnadore has alleged, and the ALJ found, that various acts of retaliation were directed against Varnadore, such as assigning him "makework" jobs; giving him poor appraisals; and purposefully isolating him from his coworkers. Only one category of retaliatory action, however, is directly pertinent to this appeal: assigning Varnadore certain office space contaminated, at least to some degree, by hazardous wastes.

In the summer of 1989, Varnadore was diagnosed with colon cancer and underwent surgery. He makes no claim that the cancer was related to his work. After he returned to work in early 1990, he was repeatedly reassigned to different groups and divisions. The reassignments resulted in "a series of miscellaneous jobs [for Varnadore,] such as inventorying idle equipment in the attic," or inventorying surplus chemicals. In March 1991, Varnadore was "officially placed under [the] supervision [of Darrell Wright] on a permanent basis."

Wright assigned Varnadore to a new "home base" in laboratory room R–151. A "home base" is where ORNL technicians are assigned desk space. Generally, technicians use their home base for phone calls and completing paper work. The ALJ found that the reason for the new assignment was an effort to "get ... [Varnadore] away from all the employees." At the time, R–151 "was a temporary storage area to accumulate waste from other laboratories. Fifty percent of the floor space was covered with waste. It had not been used as a home base for three years." It is the nature of the waste that is significant here:

> The room contained drums of radioactive waste, bags of radioactive waste, bags of asbestos waste and some waste chemicals. Some of the chemicals had a low level of radioactivity. There were also radioactive asbestos impregnated counter tops.

Both Wright and Wright's supervisor, W.D. Shults, who approved the room assignment, knew that the room contained radioactive waste, but thought the level of radioactivity was low—which, in fact, it was. There is no dispute, however, that other rooms were available for Varnadore at the time.

One day in the late summer of 1991, after Varnadore had been assigned to R–151 for about six months, a health physics technician passed by and saw Varnadore in the room. She was surprised because she had previously "assumed that it was just a RAD (radiation) waste storage area." She told Varnadore that she did not think he should be working in the room, and after taking some radiation-dose readings, told Varnadore "that either he or the drums should be moved immediately." This health physics technician told another person, who in turn told Wright "that either the occupant of the room or the drums [should] be removed."

Varnadore was next assigned to room E–259, at the beginning of September 1991. E–259 had previously been a mercury reclamation center, and was "used to store samples and waste"; it, like R–151, had not been used as a home base for three or four years. Visible mercury was in several places throughout the room. An industrial hygienist wrote to Wright at the end of October 1991, "recommend[ing] that [E–259] not be utilized as office space." Despite receiving this communication, Wright "felt there was no urgency in moving Varnadore." Several weeks later, while Varnadore was still assigned to the room, an inspection team noted that E–259 contained improperly labeled chemical hazardous waste, and described it as "a housekeeping NIGHTMARE."

Shults, Wright's supervisor, conceded at trial "that during the time [Varnadore] was in R–151 as his home base, he was receiving a daily dose of radiation in excess of normal background radiation." He also agreed with the conclusions of a survey conducted by a Department of Energy panel in March through May 1992 "that at the time [the DOE] did this survey that Rooms R–151 and E–259 were not appropriate office space," and likewise, "that a room with visible mercury is not acceptable for office space." Shults further agreed that it would have been "a simple matter" to clean up R–151 before Varnadore used it as his home base,

and the ALJ found that E–259 could also have been cleaned up in one or two days. The ALJ specifically found—based in part on explicit testimony—that "[t]he intent" behind the room assignments "was to isolate [Varnadore] from his fellow employees."

The incident that stands at the crux of this appeal occurred on November 4, 1991: a conversation between Wright and Varnadore relating to Varnadore's possible relocation back to R–151. The parties hotly dispute the tenor of this conversation, particularly whether Wright was threatening Varnadore, or whether Wright was simply neutrally discussing possibilities. Relatedly, the parties dispute whether Wright was aware of the polluted condition of R–151, or whether he believed it had been cleaned up. According to Varnadore, the following occurred:

> On Monday, November 4, 1991, he was informed by his supervisor, Mr. Wright, that the hygiene report [on E–259] was completed. Mr. Wright notified him, that since the three radioactive drums had been moved away from the desk of his previous "home base," he would probably be moved back there sometime soon.

According to Wright, however, he merely "began considering" moving Varnadore after he received the report on E–259, and "[o]ne alternative" he considered "was to move Mr. Varnadore back to R–151 from which the drums had now been removed," because he "assumed that [the drums were] the concern. So, since the concern was removed, there should have been no problem moving him back." According to Wright, he did not tell Varnadore "that he was definitely going to be reassigned to R–151," but instead "told him that that was a possibility."

The ALJ found as follows: "In November 1991 Wright told [Varnadore] moving him back to R–151 was under consideration." Elsewhere, the ALJ made a slightly different finding: "Wright told [Varnadore] that he *would* be moved back to R–151 or that such a move was under consideration." (Emphasis added.) In any event, the ALJ was clear that "[b]ags of radioactive waste remained in R–151 in the October–December time period when moving Varnadore back to R–151 was being discussed." The ALJ also found that

beginning in mid-January 1991, some ten months before the conversation in question and about two months even before Varnadore had been assigned to the room the first time, Wright had "instituted proceedings to remove the drums from [R–151]." Apparently, maintenance people had "picked up the drums but returned them in a couple of hours, refusing to accept the drums because of inadequate documentation." Wright was, for unspecified reasons, then stymied in his attempts to remove the drums until he asked a "generator certification official" to pick them up, around September 1991. Some of the waste was disposed of in mid-October, and disposal was completed by the end of 1991. The ALJ made no specific finding about Wright's knowledge of R–151's condition at the time of Wright's November 1991 conversation; instead, the ALJ simply found, without specifying any time period and without offering a citation to the record, that "it is clear that both Wright and Shults knew what the condition of these rooms were." He also found that Varnadore "was intentionally assigned to inappropriate and unpleasant office space," and subjected to "a hostile work environment."

On November 20, 1991, prior to receiving a new room assignment, Varnadore filed the first of three whistleblower complaints with the Department of Labor, which we shall call *Varnadore I*. Varnadore was then *not* relocated to R–151; instead, about two weeks after he filed the complaint, he was moved to room G–12, which was "the office of a Ph.D. on assignment away from Oak Ridge."

In July 1992, after an investigation by the Wage & Hour Division of the Department of Labor found that Varnadore had engaged in protected activity and had been retaliated against, an evidentiary hearing was held. Toward the end of an extremely lengthy and detailed recommendation, the ALJ addressed a statute of limitations argument made by the employer. The ALJ noted: "If the 30–day statute of limitations is strictly applied, then Respondent prevails. The issue, accordingly, is whether the statute should be tolled on equitable grounds." The ALJ concluded that it should be, in view of the continuing-violation doctrine:

Here, Respondent has discriminated against Complainant by fostering a hostile work environment from at least February 1990 into the post-trial period of this proceeding. For example, in this case Varnadore evidently did not realize in February 1990 that his transfer from the soil preparation laboratory was the first step in separating him from the Organic Analysis Group thus leading to an indefinite period of miscellaneous job assignments not compatible with his ... aptitudes. The hostile work environment to which he was subjected also included assignment to inappropriate office space, utilized as depositories for waste, and a deliberate policy of isolating him from his fellow workers. Also contributing to the hostile work environment in this proceeding were a number of adverse performance appraisals influenced by the hostility arising out of his protected activity. The hostile work environment culminated in August 1992 with the posting of [a] memorandum attacking and ridiculing Varnadore for pursuit of a remedy in this proceeding.

He further found that "the various acts creating the hostile work environment to which Varnadore was subjected[ ] were connected rather than isolated." He awarded $374,000 in attorney fees, and a total of $30,000 in damages.

On June 9, 1993—two days after the ALJ issued this ruling—Varnadore filed a new complaint, *Varnadore II*, alleging that his 1992 performance appraisal narrative was retaliatory, and that his salary increases over the last five years were inadequate. He also complained about a statement made by another employee, and about a press release issued by Martin Marietta following the ALJ's decision in *Varnadore I*. Finally, Varnadore filed a third complaint—*Varnadore III*—on August 2, 1994, alleging new retaliatory acts.

Meanwhile, the ALJ's decision in *Varnadore I* was being reviewed by the Secretary, who issued his opinion in early 1996, prior to an ALJ resolution of *Varnadore II and III*. The Secretary adopted the factual findings of the ALJ, but nonetheless drew different inferences from those findings and declined to adopt the ALJ's recommended decision because, the Secretary concluded, the complaint was time-barred. The Secretary found that the last retaliatory act was the reassignment of Varnadore to E–259, which act occurred on September 3, 1991. The "threat" to move Varnadore to R–151 was not a retaliatory act, the Secretary reasoned, because Wright thought the room was clean; the Secretary noted, and found significant, the fact that Varnadore was not actually ever moved back to R–151. The Secretary then reasoned that the continuing-violation doctrine did not apply because no violative act occurred within the statutory time limit; he explicitly noted the lack of an ALJ finding that a violation *did* occur within the time limit.

The Secretary deferred full consideration, however, of two incidents alleged in *Varnadore I* that were *not* time-barred. The Secretary opined that he would await ALJ rulings in *Varnadore II* and *III*, and consider all the non-time-barred incidents at once.

Eventually, in *Varnadore II*, the ALJ rejected all of Varnadore's arguments but one: although finding that Varnadore's 1992 performance appraisal was "reasonable" based on the record, the ALJ found that it was nonetheless "suspect," given demonstrated hostility by the reviewers toward Varnadore. The ALJ recommended that the appraisal be expunged, and that attorney fees of $27,000 be awarded. The employer was ordered to pay the fees immediately despite the lack of a final decision, with the provision that the fees would have to be paid back if the final decision were adverse to Varnadore. And the ALJ recommended dismissal of all of Varnadore's claims in *Varnadore III*, on multiple grounds.

In April 1996, two months after his decision in *Varnadore I*, the Secretary established the Administrative Review Board. The ARB is composed of three members, "appointed by the Secretary" and "selected upon the basis of their qualifications and competence in matters within the authority of the Board." 61 Fed.Reg. 19,979. The members' terms are staggered, and thereafter, their terms are not to exceed two years; they are, however, subject to removal by the

Secretary. *See id.* The ARB acts for the Secretary, and is responsible for "issuing final agency decisions on questions of law and fact arising in review or on appeal" in certain "wage and hour" cases previously decided by the former, and no longer existing, Wage Appeals Board and Board of Service Contract Appeals. *Id.* at 19,978. Both of these latter two entities were also created by the Department of Labor, in 1964 and 1992, respectively. In addition, the ARB decides cases arising under a number of other laws, including the whistleblower statutes invoked here. *Id.*

Two months after the ARB's creation, in June 1996, the ARB issued a final decision in all three cases. It adopted the ALJ's decision in *Varnadore II* with respect to all but one element: it found that the ALJ's analysis of the 1992 performance review was flawed. Thus, Varnadore lost on all his *Varnadore II* claims. The ARB further adopted the ALJ's findings in *Varnadore III.* And finally, the ARB concluded that the two non-time-barred incidents from *Varnadore I* were retaliatory acts, but they could not amount to a hostile work environment because they were not pervasive or regular. Relatedly, the ARB ordered, in September 1996, that the ALJ's award of immediate payment of partial attorney fees in *Varnadore II* be rescinded, and the fees repaid.

Varnadore then filed an appeal to this court.

## II.

### A.

■ Our review of the Secretary's decision must conform to the dictates of the Administrative Procedure Act, 5 U.S.C. § 706(2). Thus, we may overturn the Secretary's decision only if we find that the decision "is unsupported by substantial evidence" or if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (E); *see Lockert v. United States Dep't of Labor,* 867 F.2d 513, 516–17 (9th Cir.1989). This highly deferential standard of review is not altered merely because the Secretary disagrees with the ALJ, *see Universal Camera Corp. v.*

*NLRB,* 340 U.S. 474, 496, 71 S.Ct. 456, 468–69, 95 L.Ed. 456 (1951), and we " 'defer to the inferences that the Secretary derives from the evidence, not to those of the ALJ,' " *Lockert,* 867 F.2d at 519 n. 2 (citation omitted).

■ Varnadore first argues that the Secretary erred in finding that Varnadore's complaint was not timely, principally taking the position that the Secretary wrongly disregarded factual findings of the ALJ.

■ Varnadore does not dispute that, as the Secretary and the ALJ both found, during the period in question here, the environmental statutes under which Varnadore filed his complaints had a 30–day limitations period, generally requiring that a complaint be filed within 30 days after the occurrence of an alleged retaliatory or discriminatory act. *See Hill v. United States Dep't of Labor,* 65 F.3d 1331, 1335 (6th Cir.1995). The continuing-violation doctrine, however, provides an exception to the usual strict application of such time periods:

> Under the continuing violation standard, a timely charge with respect to any incident of discrimination in furtherance of a policy of discrimination renders claims against other discriminatory actions taken pursuant to that policy timely, even if they would be untimely if standing alone. A continuing violation exists where there is a relationship between a series of discriminatory actions and an invalid, underlying policy. Thus, in cases where the plaintiff proves i) an underlying discriminatory policy or practice, and ii) an action taken pursuant to that policy during the statutory period preceding the filing of the complaint, the continuing violation rule shelters claims for all other actions taken pursuant to the same policy from the limitations period.

*Connecticut Light & Power Co. v. Secretary of United States Dep't of Labor,* 85 F.3d 89, 96 (2d Cir.1996) (citations omitted). In other words, under the continuing-violation doctrine, a single non-time-barred act can save other acts that *are* time-barred—but the mere fact that retaliation or discrimination continued over a long period does not mean

one can simply ignore statutes of limitations altogether.

Applying the appropriate legal standard, the Secretary found, based on his review of the case, that *Wright* did not make a "threat"—which clearly would have constituted an adverse action—to Varnadore when they had their conversation on November 4, 1991, regarding Varnadore's possible relocation to R–151. He found both that the mention of R–151 was as a mere possibility, not a certainty, and that Wright had no retaliatory animus because he thought R–151 had been cleaned up. If the Secretary's decision in this regard is correct, then his collateral decision—that the complaint was time-barred because no violative act occurred within the relevant time period—is quite clearly correct as well, and Varnadore does not suggest otherwise.

■ We note, first, that no aspect of the ALJ's recommended decision contradicts the Secretary on this point; the ALJ did not explicitly find that the act *did* constitute retaliation, and did not find that Wright actually made a threat—instead, his decision is silent on those questions. But even if the ALJ *had* reached the opposite conclusion, the Secretary is not *per se* prohibited from disagreeing. In any event, it is plain that the Secretary's decision is certainly supported by substantial evidence, since it is completely in accord with Wright's testimony, and even roughly in accord with Varnadore's version of the event. We, therefore, will affirm the Secretary's decision.

### B.

The sole remaining argument raised by Varnadore is directed at the legitimacy of the ARB, which rendered the final decision in *Varnadore II* and *III* and disposed of the non-time-barred incidents that were part of *Varnadore I*. Varnadore does not attack any of the specifics of the decision itself—just the authority of the decisionmaking body. He asserts that the Secretary wrongly engaged in the congressional function of lawmaking and the "presidential" function of appointing agency board members when the Secretary created the "new-fangled" ARB. The creation of the ARB, he contends, was a major sub-stantive change, requiring either congressional approval or notice-and-comment, and the ARB's decision must therefore be vacated on the ground that the ARB's creation violates the Appointments Clause and the Presentment Clause of the Constitution.

■ Despite his peremptory assertion that the Appointments Clause and the Presentment Clause render the ARB unconstitutional, Varnadore does not bother either to provide the text of these provisions in his brief, or to explain their relevance to this case. We shall consider first the Appointments Clause, which provides that the President

> shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2.

We have already described the composition and functions of the ARB. Bearing these facts in mind, we conclude that the members of the ARB are, at most, the type of "inferior" officers that the Appointments Clause allows the heads of departments, such as the Secretary of Labor, *see* 5 U.S.C. § 101, to appoint, *see Morrison v. Olson,* 487 U.S. 654, 671–72, 108 S.Ct. 2597, 2608–09, 101 L.Ed.2d 569 (1988); *cf. Commonwealth of Pennsylvania v. United States Dep't of Health & Human Servs.,* 80 F.3d 796, 803–04 (3d Cir. 1996). And as required by the Appointments Clause, Congress has imbued the Secretary with authority to appoint inferior officers. *See, e.g.,* 5 U.S.C. § 301; 29 U.S.C. § 551; 5 U.S.C. app. at 1469; 5 U.S.C. § 901 *et seq.*

■ We turn next to the Presentment Clause, which provides, in part, that

> [e]very Bill which shall have passed the House of Representatives and the Senate, shall, before it becomes a Law, be presented to the President of the United States;

If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it.

U.S. Const. art. I, § 7, cl. 2. Having concluded, however, that the Appointments Clause was not offended by the creation of the ARB, it is unnecessary for us to consider Varnadore's Presentment Clause challenge. That is, because the establishment of the ARB and delegation to it of final decision-making responsibility is authorized under the Appointments Clause and federal law, it is plain that the Secretary has not usurped any legislative function in violation of the Constitution.

### III.

We **AFFIRM.**