United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 24, 2005**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 04-60347
_____

DONALD J. WILLY,

Petitioner,

versus

ADMINISTRATIVE REVIEW BOARD,
UNITED STATES DEPT OF LABOR

Respondent.

--------------------
Petition for Review of an Order of the
U.S. Department of Labor
--------------------

Before HIGGINBOTHAM, WIENER, and BARKSDALE, Circuit Judges.

WIENER, Circuit Judge:

This case has, since 1984, endured an odyssey through administrative and judicial tribunals, during the course of which it has appeared before us – in one form or another – on four occasions. Petitioner Donald J. Willy now petitions for review from the Department of Labor Administrative Review Board's ("ARB") dismissal of his retaliation claims against his former employers, Coastal Corporation and Coastal States Management (collectively, "Coastal"). Although we grant his petition for review, we reject Willy's challenge to the constitutionality of the ARB under the Appointments Clause of the United States Constitution, we vacate the ARB's final decision and order, and we remand in part.

## I.  FACTS AND PROCEEDINGS

### A.  Factual History

Coastal hired Willy as an in-house environmental attorney in 1981.  Coastal and its subsidiaries are in the petroleum business, including refining oil, marketing oil and gasoline, and transmitting natural gas by pipeline.  After a series of events in 1984, Coastal fired Willy.

#### 1.  The Belcher Environmental Audit Report

In early 1984, Albin Smith, President of Belcher Oil Company (a subsidiary of Coastal), asked Coastal's legal department to perform an environmental audit of Belcher's facilities.  After Willy examined the on-site reviews performed by fellow attorney Troy Webb and a regulatory analyst, George Pardue, Willy concluded in two preliminary draft reports (collectively, "the Belcher Report" or "the Report") that Belcher was exposed to liability for violating several federal environmental statutes.

Webb and other Coastal employees disagreed with Willy's conclusions.  Unbeknownst to Willy, Webb sent a memorandum to Smith, stating that Belcher's problems were less serious than Willy's drafts indicated.  Pardue conceded that Willy's conclusion that Belcher was illegally polluting was factually accurate, but also told Smith that the tone of Willy's report was "inflammatory."  At the end of March, Willy's supervisor, Clinton Fawcett, asked Willy to revise the Belcher Report and to delete reference to some

of Belcher's violations. Willy refused, then discussed the matter with Coastal's general counsel, George Brundrett, who agreed with Fawcett's assessment of the Report. Fawcett ultimately made the changes to the Report himself.

Willy testified that he began "getting the cold shoulder" from Fawcett, Brundrett, Webb, and Pardue after this incident. Fawcett later left Coastal's legal department, and William Dunker, a colleague of Willy's in the environmental legal department, became Willy's supervisor. Dunker revisited the Belcher Report and discussed the incident with Webb, who reiterated his opinion that "the whole thing was overblown" by Willy. Dunker told Brundrett that "the report was inflammatory and drew conclusions that I don't like to draw," then told Willy of his concerns.

2. Corpus Christi Refinery

In late 1983 or early 1984, Willy began performing legal work for the Corpus Christi Refinery ("the Refinery"), another Coastal subsidiary. Early in June 1984, at the request of the manager of the Refinery, Willy called the Texas Department of Water Resources ("TDWR") about a closure bond for the refinery.

Webb considered the Refinery his domain. When he visited it in the summer of 1984, he learned that the TDWR had informed Willy that Coastal might be sued because of the Refinery's financial problems. Webb was upset that Willy had not relayed this information to him and considered that Willy was infringing on what Webb regarded as his "turf."

3

In September 1984, Dunker, who had learned from Webb about the TDWR phone call, held a meeting in an effort to relieve the tension between Webb and Willy. Dunker had prepared a letter of reprimand for Willy, because Webb had complained that Willy had been saying negative things about him and "backstabbing" him. Dunker decided not to deliver the letter to Willy, however, because what Dunker learned at the meeting did not satisfy him that Willy had actually acted in the way that Webb had reported.

At the meeting, which Dunker secretly taped, Willy denied having called the TDWR. Dunker telephoned a Refinery employee, expecting to confirm that Willy had placed the call. The employee stated, however, that he did not recall telling Webb and Pardue that Willy had called the TDWR; that he could recall only that he heard that a TDWR employee, Russell Lewis, had said that there might be a lawsuit. The Refinery employee did confirm that Willy and Webb had made disparaging remarks about each other. Willy and Dunker, and sometimes Webb, then engaged in a lengthy exchange about the antagonism that Willy experienced as a result of the Belcher Report.

Soon after the meeting, Dunker called Lewis at the TDWR, and Lewis confirmed that Willy actually had contacted him. Dunker decided to fire Willy and obtained Brundrett's agreement. Dunker first met with Willy and again secretly taped their conversation. At this meeting, Dunker called Lewis and allowed Willy to question

4

him.    After Lewis confirmed that Willy had spoken with him about financial assurances, Dunker severely criticized Willy's breach of trust and asked him to resign.    When Willy refused, Dunker orally fired him on the spot.    An October 1 written termination notice authored by Brundrett states: "The primary purpose for this termination is the fact that you failed to report certain actions taken by you with respect to the Corpus Christi Refinery environmental matters.    When asked if you had taken such action, you unequivocally [sic] denied taking such action."

B.    Procedural History

  1.    Complaint to the Department of Labor

In October 1984, Willy filed a complaint with the Department of Labor ("DOL"), alleging that Coastal had violated the whistleblower provisions of several environmental statutes by firing him in retaliation for writing the Belcher Report. Specifically, Willy sued under the Clean Air Act,[1] the Water Pollution Control Act,[2] the Safe Drinking Water Act,[3] the Resource Conservation and Recovery Act,[4] the Toxic Substances Control Act,[5] and the Comprehensive Environmental Response, Compensation

---

[1] 42 U.S.C. § 7622 (1988).

[2] 33 U.S.C. § 1367 (1988).

[3] 42 U.S.C. § 300j-9(i) (1988).

[4] 42 U.S.C. § 6971 (1988).

[5] 15 U.S.C. § 2622 (1988).

Environmental Response, Compensation and Liability Act[6] (collectively, "the Acts").

The Wage and Hour Division ("WHD") of the DOL investigated Willy's complaint and found in his favor. The WHD ordered reinstatement and damages.

### 2.   Administrative Law Judge's Order of Production

Coastal appealed the WHD's ruling and requested a hearing before a DOL administrative law judge ("ALJ").  Willy sought extensive discovery, including introduction of the Belcher Report. Coastal objected to the production of the Report and other documents related to it based on the attorney-client and work-product privileges.  Willy filed a motion to compel production, which the ALJ granted.  The ALJ relied on Doe v. A Corp.[7] in holding that the documents, although confidential, were admissible because Willy "could not effectively litigate his claim without access to the documents in question."  Coastal refused to comply, and the ALJ ordered Willy to seek enforcement of its order of production in the district court.

### 3.   ALJ's Recommendation of Dismissal

Before Willy could do so, however, the ALJ recommended that Willy's complaint be dismissed in light of our then-recent opinion

---

[6] 42 U.S.C. § 9610 (1988).

[7] 709 F.2d 1043, 1048 (5th Cir. 1983).

in Brown & Root, Inc. v. Donovan.[8]  The ALJ concluded that under the whistleblower provision of the Energy Reorganization Act ("ERA"), "employee conduct which does not involve the employee's contact or involvement with a competent organ of government is not protected."  The ALJ found that the language of the ERA's whistleblower provision was substantially identical to the language of those of the Acts under which Willy had sued and that Willy's actions were solely internal.  Thus, reasoned the ALJ, Willy's conduct was not protected.

### 4.    Secretary's Reversal of Recommended Dismissal

On appeal to the DOL Secretary, Willy argued that he was terminated in part because he contacted government environmental agencies.  The Secretary ultimately rejected the ALJ's recommended dismissal, reasoning that, notwithstanding Brown & Root, Willy did not have an adequate opportunity to prove that he had contacted government agencies and that the Belcher Report constituted protected activity under the Acts.  The Secretary also concluded that, contrary to Coastal's arguments, there was nothing in any of the statutes or their legislative histories to indicate that in-house attorneys are excluded from statutory protection. The Secretary further encouraged us to reconsider our holding in Brown & Root in light of the Tenth Circuit's more recent decision in

---

[8] 747 F.2d 1029 (5th Cir. 1984).  In Brown & Root, we held that the filing of purely internal quality control reports by "whistleblowers" did not constitute protected activity under the Energy Reorganization Act, 42 U.S.C. § 5851(a).  See id. at 1031.

7

Kansas Gas & Electric Co. v. Brock.[9]

### 5. Our Refusal to Intervene

On remand, the ALJ again ordered Willy to seek enforcement of the production order and resolution of Coastal's privilege claims in district court. Willy instead petitioned us under the All Writs Act to resolve the discovery dispute. We declined review, reasoning that "intervention at this time to resolve the discovery would . . . interrupt the administrative process" and that "[i]ntervention at this time is . . . unnecessary."[10]

### 6. ALJ's Hearing on Remand

In a March 1998 hearing on remand before an ALJ, Coastal continued to refuse to produce the Belcher Report, basing its refusal on the attorney-client privilege. The ALJ nevertheless admitted two draft versions of the Report that were in Willy's possession. Based on these drafts, the ALJ found in favor of Willy, reasoning that he was fired both because of Coastal's perception that he had lied about calling the TDWR and for having written the Belcher Report in the first place. Applying a mixed-motive analysis, the ALJ concluded that the animus towards Willy arising from the Belcher Report and Willy's "subsequent lie about the phone call are inextricably mixed. Under the circumstances, no

---

[9] 780 F.2d 1505 (10th Cir. 1985). In Kansas Gas, the Tenth Circuit held that the filing of internal safety complaints was protected activity under the ERA. See id. at 1512-13.

[10] In re Willy, 831 F.2d 545, 549-50 (5th Cir. 1987).

8

finding can be made that Donald Willy would have been fired solely for lying about the phone call had he not engaged in protected activity." The ALJ declined to grant Willy relief, however, because the judge concluded that Willy had offered "misleading testimony" about his current employment status.

7. Secretary's Review of ALJ's Rulings

On automatic review, the Secretary agreed with the ALJ's Recommended Decision and Order that Coastal fired Willy in part because he wrote the Belcher Report. The Secretary also affirmed the ALJ's 1987 holding that writing the Belcher Report constituted protected conduct, notwithstanding our decision in Brown & Root. The Secretary concluded that Brown & Root applied to the ERA only and did not purport to interpret environmental whistleblower statutes.[11] The Secretary relied on, inter alia, various Rules of Professional Conduct and our opinion in Doe in concluding that the Belcher Report was admissible evidence under both federal and Texas

---

[11] Neither party disputes that Willy's writing of the Belcher Report is protected conduct under the relevant statutes. Congress clarified by statute that Brown & Root was incorrect in holding that complaints to employers were not protected under 42 U.S.C. § 5851. Stone & Webster Eng'g Corp. v. Herman, 115 F.3d 1568, 1576 (11th Cir. 1997) ("The legislative history of the 1992 Energy Policy Act, too, makes clear that Congress intended the amendments to codify what it thought the law to be already. Congress sought 'to explicitly provide whistleblower protection for nuclear industry employees [who] (1) notify their employer of an alleged violation rather than a federal regulator.'" (quoting H.R. No. 102-474(VIII), at 78, reprinted in 1992 U.S.C.C.A.N. 1953, 2282, 2296 (emphasis added)).

law.  The Secretary affirmed the ALJ's ruling and remanded the case to the ALJ to calculate back pay.

We denied Coastal's interlocutory petition for review of the Secretary's ruling in October 1994, ten years to the month after Willy's original filing.  The following July, the DOL Secretary denied reconsideration of his decision. The ALJ then issued a Recommended Decision and Order on Damages, Fees and Costs for $977,513.44 in damages and $68,270 in attorney's fees and expenses. Willy and Coastal both appealed to the Administrative Review Board ("ARB"), which by then had replaced the Secretary in the decision-making process.

In February 2004, the ARB issued its Final Decision and Dismissal Order, which reversed the prior orders of the DOL Secretary and the ALJ on remand.  The ARB upheld the ALJ's conclusion that federal law governed the issue of attorney-client privilege, then determined that no exception to the privilege existed to admit the Belcher Report and other related documents. The ARB also concluded that under Texas attorney-client privilege law, the result would prove the same.  Willy timely filed his notice of appeal.

8.   Willy's Parallel State Court Action

Concurrent with his administrative proceedings, Willy pursued his claims against Coastal in the state courts of Texas.  In 1985, after the ALJ's first recommendation of dismissal, Willy filed a state-law wrongful discharge claim in state court.  In it he

10

alleged that Coastal wrongfully terminated him under the Texas public policy exception to the employment-at-will doctrine, viz., that it fired him for refusing to perform an illegal act.[12] Coastal removed the case to federal court on the basis of federal question jurisdiction. The district court dismissed the case, reasoning that the Texas Canons of Ethics and Disciplinary Rules precluded an attorney from bringing such a cause of action.[13]

On appeal, we reversed and remanded the matter to the district court with instructions to remand to the state court because removal had been improper.[14] On remand to state court, a jury found in favor of Willy and awarded him actual and punitive damages.[15] The Texas Court of Appeals reversed, reasoning that although Texas's canons of ethics allow in-house counsel to maintain a wrongful termination suit under the public policy exception, they prohibit the use of confidential client information to prove such

---

[12] See Sabine Pilot Serv., Inc. v. Hauck, 687 S.W.2d 733 (Tex. 1985) (holding that public policy requires narrow exception to employment-at-will doctrine when employee is fired for the sole reason that he refuses to perform an illegal act).

[13] Willy v. Coastal Corp., 647 F. Supp. 116 (S.D. Tex. 1986).

[14] Willy v. Coastal Corp., 855 F.2d 1160, 1173 (5th Cir. 1988). We also set aside the district court's Rule 11 sanctions order because it did not comply with the principles announced in Thomas v. Capital Security Services, Inc., 836 F.2d 866 (5th Cir. 1988). We thus remanded the sanctions issue to the district court. See Willy, 855 F.2d at 1173.

[15] Willy v. Coastal States Mgmt. Co., 939 S.W.2d 193, 194 (Tex. App. 1996).

a claim.  The court held that, even under Texas's self-defense provision which allows lawyers to reveal confidences when necessary to defend themselves against an accusation of wrongful conduct, the Belcher Report was privileged and thus inadmissible.  Willy petitioned to the Supreme Court of Texas for a writ of error, which that court denied in 1998.

## II. ANALYSIS

### A.    Standard of Review

We must affirm the ARB's decision unless it is arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.[16] Factual findings are subject to substantial evidence review.[17] Agency interpretations of our case law are reviewed de novo.[18]  We also review Willy's constitutional Appointments Clause challenge de novo.[19]

### B.    The Appointments Clause

Willy first contends that the creation of the ARB violates the

---

[16] 5 U.S.C. § 706(2)(A).

[17] Id. § 706(2)(E); Williams v. Admin. Review Bd., 376 F.3d 471 (5th Cir. 2004).

[18] Macktal v. U.S. Dep't of Labor, 171 F.3d 323, 326 (5th Cir. 1999)

[19] Tex. Office of Pub. Util. Counsel v. FCC, 183 F.3d 393, 419 n. 34 (5th Cir. 1999).

Appointments Clause of the Constitution.[20]  Specifically, Willy asserts that Congress has not granted authority to the DOL Secretary to appoint ARB members and to delegate his decision-making authority to them as inferior officers.  Willy contends that "Congress'[s] generic delegation to the Secretary of Labor at 29 U.S.C. § 551 contains no officer appointment authority, and there is no authority in any federal environmental statute to appoint inferior officers for purposes of hearing employee protection claims."[21]  He notes that nothing in the United States Code titles that expressly authorizes the creation of other administrative boards explicitly authorizes the ARB's creation.  Willy maintains that "Congress never intended adjudication powers be re-delegated" by the DOL Secretary, "to whom Congress delegated authority," to "a non-responsible authority."  Willy therefore asks us to enforce the DOL Secretary's order upholding his cause of action and to disregard any decision by the ARB as it "is not a legitimate subordinate" of Congress.

Article II states:

[The President] shall nominate, and by and with the

---

[20] Willy raises this issue for the first time on appeal. This does not affect our jurisdiction or our standard of review. See Freytag v. Commissioner, 501 U.S. 868, 878-79 (1991) (noting that a court may, in its discretion, entertain a constitutional challenge to the special appointment of a "Special Tax Judge" because it involves the strong interest of the judiciary in maintaining the "constitutional plan" of separation of powers (citing Glidden Co. v. Zdanok, 370 U.S. 530, 536 (1962)).

[21] Emphasis in original.

13

advice and consent of the Senate shall appoint . . . all other officers of the United States, whose appointments are not herein otherwise provided for and which shall be established by law. But the Congress may, by law, vest the appointment of such inferior officers as they may think proper . . . in the heads of departments.[22]

In April 1996, the DOL Secretary created the ARB. The ARB is composed of three members, each of whom is appointed by the Secretary for terms of two years or less and is subject to removal by the Secretary.[23] The ARB acts for the Secretary and "issu[es] final agency decisions on questions of law and fact arising in review or on appeal" in whistleblower cases.[24]

We must first determine whether the ARB members are "principal" or "inferior" officers for purposes of the Appointments Clause. Willy bases his Appointments-Clause challenge on the assumption that an ARB member is an inferior officer of the United States. Willy asserts that ARB members are inferior officers because they make final decisions for the Department of Labor.[25] The Secretary does not contest that ARB members are "inferior officers," so, for purposes of this appeal, we assume that they are.

Even though we recognize that no specific federal statute

---

[22] U.S. CONST. art. II, § 2, cl. 2.

[23] Secretary's Order 102992, 67 Fed. Reg. 64272, 64273 (Oct. 17, 2002); 61 Fed. Reg. 19,978.

[24] 61 Fed. Reg. 19,978; see also Varnadore v. Sec'y of Labor, 141 F.3d 625, 630 (6th Cir. 1998).

[25] See Landry v. FDIC, 204 F.3d 1125 (D.C. Cir. 2000).

14

creates the ARB, we hold that the Secretary possesses the requisite congressional authority to appoint members to the ARB to issue final agency decisions. As the Secretary points out, other circuits have held that Article II "does not require that a law specifically provide for the appointment of a particular inferior officer. To the contrary, 'the Constitution affords Congress substantial discretion to fashion appointments within the specified constraints.'"[26]

The broad language employed by Congress in the Reorganization Plan No. 6 of 1950 and in 5 U.S.C. § 301 vests the Secretary with ample authority to create the ARB, appoint its members, and delegate final decision-making authority to them. The Reorganization Plan states that "[t]he Secretary of Labor may from time to time make such provisions as he shall deem appropriate authorizing the performance by any other officer, or by any agency or employee, of the Department of Labor of any function of the

---

[26] Pennsylvania v. U.S. Dep't of Health and Human Servs., 80 F.3d 796, 804–05 (3rd Cir. 1996) (quoting Silver v. U.S. Postal Serv., 951 F.2d 1033, 1037 (9th Cir. 1991)).
Indeed, in Pennsylvania, the Third Circuit rejected a challenge to the composition and appointment of the Department of Health and Human Services Appeals Board. Relevant to our discussion here, the Third Circuit rejected Pennsylvania's argument that Congress provide specifically in the statute for the entity to which the Secretary appoints members. See id. at 805. To do so, the court reasoned, would "defeat the purpose of the relaxed requirements for 'inferior officer' appointments": "The convenience afforded by inferior officer appointments would hardly be served if we were to require Congress to account for every potential inferior officer appointment in its statutory grant of authority to the department head." Id.

15

Secretary. . . ."[27]  Other courts have held that this "provision explicitly authorizes a subdelegation of authority by the Secretary of Labor."[28]  Further, Section 301 provides broad authority to the Secretary to "prescribe regulations for the government of his department . . . [and] the distribution and performance of its business . . . ."[29]  In the only case to address directly an Appointments-Clause challenge to the ARB, the Sixth Circuit relied on this language to uphold the Secretary's delegation of authority to the ARB.[30]  We agree with the Sixth Circuit and conclude that these provisions imbue the Secretary with the authority to create the ARB, appoint its members, and delegate final decision-making authority to them.

To support his argument that the Secretary's appointment of ARB members and delegation of final decision-making authority to

---

[27]  Reorg. Plan No. 6 of 1950, § 2, 15 Fed. Reg. 3174 (1950), 64 Stat. 1263.

[28]  Donovan v. Nat'l Bank of Alaska, 696 F.2d 678, 681 (9th Cir. 1981); see also United States v. Marshall Durbin & Co., 363 F.2d 1 (5th Cir. 1966) ("The Act, applicable to all agencies, included provisions authorizing any officer of a Government agency to delegate any of his functions."); FTC v. Gibson, 460 F.2d 605 (5th Cir. 1972) (per curiam) ("That Act, expressly permits reorganization plans which involve the 'authorization of any officer to delegate any of his functions' where appropriate to effectuate any of the Act's purposes." (quoting 5 U.S.C. § 903(a)(5)).

[29] 5 U.S.C. § 301.

[30] Varnadore, 141 F.3d at 631 (citing 5 U.S.C. § 301; 29 U.S.C. § 551; 5 U.S.C. app. at 1469; 5 U.S.C. § 901 et seq. as statutes providing the Secretary with the requisite authority to create the ARB).

16

the ARB is violative of the Appointments Clause, Willy principally relies on three cases, <u>Freytag v. Commissioner</u>,[31] <u>Ryder v. United States</u>,[32] and <u>Edmond v. United States</u>.[33]  Willy cites <u>Ryder</u> and <u>Edmond</u> for the general propositions that (1) the Appointments Clause preserves the structural integrity of the Constitution by preventing the diffusion of appointive power, and (2) the clause is one of the most significant structural safeguards of the constitutional scheme.  We recognize that this is so,[34] but both <u>Ryder</u> and <u>Edmond</u> are otherwise inapposite.

In <u>Ryder</u>, the Court treated the <u>de facto</u> officer doctrine.[35] The petitioner there challenged the Court of Military Appeals's holding that even though the appointment of two civilian judges to the Coast Guard Court of Military Review violated the Appointments Clause, the petitioner's conviction was valid under the <u>de facto</u> officer doctrine.[36]  The Court held only that the "court of Military Appeals erred in according <u>de facto</u> validity to the actions of the

---

[31] 501 U.S. 868 (1991).

[32] 515 U.S. 177 (1995).

[33] 520 U.S. 651 (1997).

[34] <u>Edmond</u>, 520 U.S. at 659; <u>Ryder</u>, 515 U.S. at 182.

[35] 515 U.S. at 180.

[36] <u>See id.</u> at 179-80.  "The <u>de facto</u> officer doctrine confers validity upon acts performed by a person acting under the color of official title even though it is later discovered that the legality of that person's appointment or election to office is deficient."  <u>Id.</u> at 180 (citing <u>Norton v. Shelby County</u>, 118 US. 425 440 (1886)).

civilian judges of the Coast Guard Court of Military Review" and that the petitioner was entitled to review before a properly constituted court.[37]  Holding, as it did, on the basis of the <u>de facto</u> officer doctrine, <u>Ryder</u> provides no support for Willy's arguments.

Willy also cites <u>Edmond</u> as support for his aforesaid general propositions, yet he expends little effort to explain <u>Edmond</u>'s relevance here.  In <u>Edmond</u>, the Court considered (1) whether the Secretary of Transportation has the authority to appoint members of the Coast Guard Court of Criminal Appeals ("CGCCA"), and (2) whether the members of the CGCCA are principal or inferior officers.[38]  As we have earlier assumed for purposes of this appeal that the members of the ARB are inferior officers, that question is not before us.  Further,  although the <u>Edmond</u> Court held that 49 U.S.C. § 323(a)[39] provided explicit authority to the Secretary of Transportation to appoint judges to the CGCCA,[40] nothing in <u>Edmond</u> requires such explicit language.  Accordingly, <u>Edmond</u> too provides little or no support for Willy's arguments.

Neither does <u>Freytag</u> support Willy.  In <u>Freytag</u>, the key issue

---

[37] <u>Id.</u> at 188.

[38] 520 U.S. at 655-56.

[39] Section 323(a) provides "[t]he Secretary of Transportation may appoint and fix the pay of officers and employees of the Department of transportation and may prescribe their duties and powers." 49 U.S.C. § 323(a).

[40] 520 U.S. at 658.

18

was whether the Chief Judge of the United States Tax Court was the appropriate repository for the appointment (of "inferior officers") power which, as noted above, is vested only "in the President alone, in the Courts of Law, or in the Heads of Department."[41] Willy does not dispute that the DOL Secretary is the "Head of a Department," nor could he do so.[42] The Freytag issue is simply not present here.

Finally, Willy contends that even if the DOL Secretary possesses the legitimate authority to establish the ARB, the Secretary's final decision is entitled to deference when a conflict exists between it and the ARB. In other words, Willy asserts that because the Secretary is the head of the department, we should afford greater deference to his final decision —— this time, in favor of Willy —— than to the ARB's final decision. Willy cites Martin v. Occupational Safety and Health Review Commission[43] to support his argument. Willy's argument is meritless.

In Martin, the Supreme Court treated the issue "to whom should a reviewing court defer when the Secretary of Labor and the Occupational Safety and Health Review Commission furnish reasonable but conflicting interpretations of an ambiguous regulation

---

[41] 501 U.S. at 877-78 (citing U.S. CONST. art. II, § 2, cl. 2).

[42] See 5 U.S.C. § 101 (stating that the Department of Labor is an Executive Department); 29 U.S.C. § 551 (stating that the Secretary of Labor is the head of the Department of Labor).

[43] 499 U.S. 144 (1991).

19

promulgated by the Secretary under the Occupational Safety and Health Act [("OSHA")] of 1970 . . . ."[44] The Court observed that the dispute arose "under the unusual regulatory structure established by the Act."[45] Specifically, the Court noted that the Act granted <u>enforcement and rulemaking</u> authority to the Secretary of Labor and <u>adjudicative</u> authority to the Commission.[46] The Court then held that, as the Act granted the Secretary the authority "to promulgate and to enforce national health and safety standards," courts should grant deference to the Secretary's, rather than the Commission's, interpretation.[47]

That situation is not present here. There is no "split authority" under the whistleblower statutes. The relevant statutes expressly grant rulemaking, enforcement, and adjudicative authority to the Secretary, so no potential for conflict exists. Additionally, no conflicting interpretations of statutes promulgated by the <u>Secretary</u> are at issue here. The difference between the Secretary's and the ARB's final decisions rests in their conflicting interpretations of federal common law or —— possibly —— Texas state law.

We hold that the language of 29 U.S.C. § 301 and of the

---

[44] <u>Id.</u> at 146.

[45] <u>Id.</u> at 152.

[46] <u>See id.</u> (emphasis added).

[47] <u>Id.</u>

20

Reorganization Plan No. 6 of 1950 is broad enough to allow the Secretary to create the ARB, appoint its members, and delegate decision-making authority to it. We hold that the DOL Secretary's appointment of ARB members and delegation of decision-making authority to them do not violate the Appointments Clause of the Constitution.

C.   Attorney-Client Privilege

Having resolved the threshold issue of the violation vel non of the Appointments Clause, we turn to the merits question of the scope of the attorney-client privilege. Willy insists that, in accordance with the DOL Secretary's 1994 opinion, the Belcher Report is admissible despite the attorney-client privilege.[48]

Relying on statutory exceptions to the attorney-client privilege, Supreme Court Standard 503(d)(3), the Model Code of Professional Responsibilities DR 4-101(C)(4), and our decision in Doe v. A Corp.,[49] the Secretary ruled that the Belcher Report was admissible despite Coastal's assertion of the attorney-client privilege. In its February 2004 order, the ARB reversed the Secretary's order, concluding that no exception applies to exempt the Report from the attorney-client privilege and that the DOL Secretary erred when he admitted it into evidence. The ARB accordingly dismissed Willy's complaint because his action fails

---

[48] The parties do not dispute that the Belcher report is privileged material.

[49] 709 F.2d 1043 (5th Cir. 1983).

without the availability of the Belcher Report. The parties now dispute whether the DOL Secretary or the ARB is correct.[50]

The parties first contest whether federal or state law governs our analysis of the attorney-client privilege. We have no difficulty in concluding that federal law applies here. "Questions of privilege that arise in the course of adjudication of federal rights are 'governed by the principles of the common law as they may be interpreted by the courts of the United States in the light

_____

[50] In 1994, Secretary Reich lifted the protective order that the ALJ had issued to keep the Belcher Report under seal. After oral argument in this appeal, we asked for supplemental briefing as to whether the lifting of the protective order ⸺ i.e., "publishing" the report ⸺ had any effect on the issue of attorney-client privilege, viz., whether it rendered this controversy moot. It is now clear that because we can order relief in this case, even if the report has been published, the controversy is not moot. See Church of Scientology of Ca. v. United States, 506 U.S. 9 (1992) (holding that, even after Internal Revenue Service obtained confidential tapes, the remedy of ordering the Government to destroy or to return any and all copies of the tapes was enough to prevent the matter from being moot).
We have no authority "to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before" us. Church of Scientology, 506 U.S. at 12. If an event occurs that prevents us from granting "any effectual relief whatever" to a prevailing party, the controversy is moot, and the appeal must be dismissed. See id.
The current Secretary argues that "this Court need not be concerned that it can no longer grant meaningful relief to Coastal as a result of" the previous Secretary's order in favor of Willy, which took into account the privileged material (the Belcher Report). The current Secretary notes that we may provide relief by affirming the ARB's dismissal of Willy's complaint and the exclusion of the Belcher Report. That it is within our power to affirm the ARB and exclude the privileged material is "effectual relief," and the controversy is therefore not moot.

22

of reason and experience.'"[51]  As Willy's claims arise under federal law —— and are before us on federal question jurisdiction under 28 U.S.C. § 1331 —— the federal common law of attorney-client privilege governs our analysis.

The attorney-client privilege is the "oldest of the privileges for confidential communications known to the common law."[52]  The central purpose of the privilege is to "encourage full and frank communications between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice."[53]  This purpose allows clients to "make full disclosure to their attorneys"[54] of past wrongdoings to obtain "the aid of persons having knowledge of the law and skilled in its practice."[55]

Coastal's assertion of the attorney-client privilege with respect to the Belcher Report in response to Willy's attempt to maintain his personal cause of action against his former client "creates a conflict with another fundamental policy: the

---

[51] United States v. Zolin, 491 U.S. 554, 562 (1989) (citing FED. R. EVID. 501).

[52] Upjohn Co. v. United States, 449 U.S. 383, 389 (1981).

[53] Id.

[54] Fisher v. United States, 425 U.S. 391, 403 (1976).

[55] Zolin, 491 U.S. at 562 (citing Hunt v. Blackthorn, 128 U.S. 464, 470 (1888)).

23

availability of a legal forum for the adjudication of rights."[56] We have recognized that, "[w]hile the Boddie [v. Connecticut] principle does not give any broad 'right' of access to federal court, the courtroom door should not lightly be barred to a person who has a tenable legal claim."[57]

Accordingly, we – and the law – have recognized exceptions to the general rule that an attorney may not disclose his client's confidences. Willy advances three exceptions to the attorney-client privilege under which the Belcher report is admissible. He asserts first that the Report is admissible under the "breach of duty" exception; next, that Coastal waived any attorney-client privilege when it placed the Belcher report at issue in the litigation; and last, that the report is admissible under the crime-fraud exception.

1.   Breach of Duty

With respect to Willy's contention that the "breach of duty" exception applies, we conclude that the ARB's rejection of this exception is contrary to law. We therefore vacate and remand.[58] Supreme Court Standard 503(d) states that no attorney-client

---

[56] Doe, 709 F.2d at 1048.

[57] Id. In Boddie v. Connecticut, the Supreme Court held that, in certain circumstances, the due process clause of the Fourteenth Amendment protects a party's access to the courts. 401 U.S. 371 (1971).

[58] As we find merit in Willy's first argument, we do not reach the other two.

24

privilege exists "[a]s to a communication relevant to an issue of breach of duty by the lawyer to his client or by the client to the lawyer . . . ."[59]  In addition, no privilege exists under Rule 1.6(b)(2) of the Model Rules of Professional Conduct in similar circumstances:

> A lawyer may reveal . . . information [relating to representation of a client] to the extent the lawyer reasonably believes necessary . . . to establish <u>a claim</u> or defense <u>on behalf of the lawyer in a controversy between the lawyer and the client</u>, to establish a defense to a criminal charge or civil claim against the lawyer based upon conduct in which the client was involved, <u>or to respond to allegations in any proceeding concerning the lawyer's representation of the client</u>.[60]

The Model Code of Professional Responsibilities Disciplinary Rule 4-101(c) also provides the "breach of duty" exception to the general rule.

Willy insists that the ARB incorrectly read into the breach-of-duty exception a requirement that privileged communications only be used <u>defensively</u>.  Relying on <u>Siedle v. Putnam Investments, Inc.</u>, the ARB held that an attorney may use privileged documents <u>only</u> as a shield and never as a sword.  In <u>Siedle</u>, the defendant, Putnam Investments, Inc. ("Putnam") had employed the plaintiff Siedle as in-house counsel.  The parties signed a mutual termination agreement, but Siedle continued to maintain a retirement account with Putnam.  After it discovered that a

---

[59] SUPREME COURT STANDARD 503(d)(3), <u>reprinted in</u> WEINSTEIN'S EVIDENCE, 503-1 to 2 (1992).

[60] MODEL RULES OF PROF'L CONDUCT R. 1.6(b)(2) (1983).

clerical error had improperly credited $15,000 to that account, Putnam unilaterally deducted that amount from it. Angry, Siedle told his tale to Pensions & Investments, a weekly trade magazine. Putnam responded, unfavorably to Siedle.

Siedle sued in state court for breach of contract and various other claims. Putnam removed the suit to federal district court on the basis of diversity of citizenship, then moved for a temporary restraining order, a seal order, and a preliminary injunction to keep Siedle from divulging information protected by the attorney-client privilege. When the New York Times learned of the suit, it intervened and urged the district court to lift the seal order. The district court granted the motion, and Putnam appealed.

The First Circuit rejected Siedle's claim that an attorney may use the self-defense exception to introduce privileged information offensively: "We believe that the exception is designed to function only as a shield, not as a sword."[61] Notwithstanding this broad pronouncement, however, the First Circuit recognized the limited effect of its holding:

> Let us be perfectly clear. We do not hold that the materials which Putnam claims are privileged necessarily must remain under permanent seal. As the record develops and additional facts are adduced, the district court may find that Putnam's claims of privilege are unsupported or that some applicable exception penetrates the attorney-client privilege. Until such time, however, we hold that Putnam's unrebutted prima facie showing that the attorney-client privilege applies entitles it to

---

[61] Siedle, 147 F.3d at 11.

26

protection.[62]

The current DOL Secretary and Coastal – and the ARB – cite Siedle as support for the proposition that the self-defense exception to the attorney-client privilege may be used only as "a shield, and not as a sword," i.e., an attorney may use privileged documents only as a defense against charges brought against him by his client. We recognize that Siedle stands for only this narrow proposition. With all due respect to our sister circuit, however, we conclude that it and the ARB have misinterpreted —— and misquoted —— the case law on which they rely.

The case law amply demonstrates the narrower proposition that the attorney-client privilege only prohibits a party from simultaneously using confidential information as both a shield and a sword.[63]  Stated differently, the "shield and sword" analogy is conjunctive: it does not stand broadly for the proposition that an attorney may never use confidential information offensively.  That

---

[62] Id. at 12 (emphasis added).

[63] See, e.g., Bittaker v. Woodford, 331 F.3d 715, 719 (9th Cir. 2003) ("The principle is often expressed in terms of preventing a party from using the privilege as both a shield and a sword." (emphasis added)); Nguyen v. Excel Corp., 197 F.3d 200, 207 n. 18 (5th Cir. 1999) ("In accord with this principle is a client's inability to, at once, employ the privilege as both a sword and a shield. . . Attempts at such improper dual usage of the privilege result in waiver by implication."); United States v. Workman, 138 F.3d 1261, 1264 (8th Cir. 1998) ("The attorney client privilege cannot be used both as a shield and a sword."); United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir. 1991) ("However, the attorney-client privilege cannot at once be used as a shield and a sword.").

analogy is a product of our parallel reasoning behind the doctrine of implied waiver: a party may not use privileged information both offensively and defensively at the same time.[64]  In other words, when a party entitled to claim the attorney-client privilege uses confidential information against his adversary (the sword), he implicitly waives its use protectively (the shield) under that privilege.

In addition, the ARB misinterpreted the holding of Siedle and the law on which that holding relied.  First, it is indisputable that the Siedle court based its holding on Massachusetts law, not federal law.[65]  Second, as noted above, the Siedle court treated whether a seal order should remain in effect and was primarily concerned with the right of the public – particularly, the press – to have access to court records, not with the attorney's use of the confidential information against his client/employer.[66]  It must be remembered that the basis of the Siedle appeal was the district court's unsealing of the record – an order brought about by motion

---

[64] See, e.g., Nguyen, 197 F.3d at 207 n. 18 ("Attempts at such improper dual usage of the privilege result in a waiver by implication.").

[65] 147 F.3d at 11 ("Massachusetts narrowly construes the exceptions to an attorney's duty to guard client confidences."). Putnam removed on the basis of diversity jurisdiction which, as we have noted, is not the foundation of our jurisdiction here.

[66] See id. at 12 ("When an attorney and a former client embroil themselves in adversarial litigation, the right of public access to judicial records stands in sharp contrast to the lawyer's duty to hold information obtained from the client during the course of representation in the strictest confidence.").

28

of The New York Times.[67]  The Siedle court neither explicitly nor implicitly held that the attorney could never use confidential information against his employer.  It merely reversed the district court's order that the seal should be lifted.

The other case on which the current DOL Secretary, Coastal, and the ARB relied are equally inapposite.  Kachmar v. Sungard Data Systems, Inc.[68] did not hold that, in a Title VII suit, an attorney-plaintiff can never use privileged information obtained during representation against the client.  The plaintiff in Kachmar, formerly in-house counsel for Sungard Data Systems, Inc. ("Sungard"), sued her employer for retaliation under Title VII, alleging that she had been fired unlawfully after she alleged that Sungard engaged in a pattern and practice of sex discrimination.[69]  When the district court dismissed her suit, Kachmar appealed.  Regarding the aspect of the attorney-client issue raised by Sungard, the Third Circuit stated:

> We do not suggest that concerns about the disclosure of client confidences in suits by in-house counsel are unfounded, but these concerns alone would not warrant dismissing a plaintiff's case, especially where there are other means to prevent unwarranted disclosure of confidential information.
> In balancing the needed protection of sensitive information with the in-house counsel's right to maintain the suit, the district court may use a number of equitable measures at its disposal "designed to permit

[67] See id. at 9.

[68] 109 F.3d 173 (3rd Cir. 1997).

[69] See id. at 176-77.

29

the attorney plaintiff to attempt to make the necessary proof while protecting from disclosure client confidences subject to the privilege." <u>General Dynamics</u> [<u>Corp. v. Superior Court</u>], 876 P.2d [487], at 504 [(Cal. Ct. App.). . . (en banc)]. <u>Among those referred to in</u> General Dynamics <u>were "[t]he use of sealing and protective orders, limited admissibility of evidence, orders restricting the use of testimony in successive proceedings, and, where appropriate, in camera proceedings.</u>" Admittedly, this may entail more attention by a judicial officer than in most other Title VII actions, but we are not prepared to say that the trial court, after assessing the sensitivity of the information offered at trial, would not be able to draft a procedure that permits vindicating Kachmar's rights while preserving the core values underlying the attorney-client relationship.[70]

The <u>Kachmar</u> court did not hold that a plaintiff-attorney could never use privileged information offensively, only that the district court must take precautions to safeguard such information by weighing the need to protect it against the attorney's need to maintain his suit. We reject the ARB's conclusion that either <u>Siedle</u> or <u>Kachmar</u> stands for the overbroad proposition that the attorney-client privilege is a <u>per se</u> bar to an attorney's use of privileged information in a claim against his former client or employer.

<u>Doe v. A Corp.</u> is our controlling precedent on the right of an attorney to maintain a suit against his former client or employer when the claim implicates communications allegedly protected by the attorney-client privilege.[71] In it we held that

---

[70] <u>Id.</u> at 181-82 (emphasis added).

[71] Coastal and the Secretary also cite to <u>Douglas v. DynMcDermott Petroleum Operations Co.</u> as support for the

30

> [a] lawyer, however, does not forfeit his rights simply because to prove them he must utilize confidential information.  Nor does the client gain the right to cheat the lawyer by imparting confidences to him.
>     The sole interest A Corporation can assert, other than defeating Doe's claim, is preservation of confidentiality for the secrets Doe learned while in its employment.  The corporation's interest in confidentiality, however, <u>can at least be partially protected by anonymity</u>.  There is no interest in allowing a corporation to conceal wrongdoing, if in fact any has occurred.[72]

We therefore allowed Doe to maintain his suit.  The ARB cites <u>Doe</u> for the proposition that the lawyer "was permitted to use information that he acquired during his employment that was not

---

proposition that "an attorney's Title VII right to oppose her employer-client's allegedly discriminatory practices by disclosing confidential information" must yield to an "employer-client's right to ethical representation and the profession's interest in assuring the ethical conduct of its members."  144 F.3d 364, 376 (5th Cir. 1998).  We do not read <u>Douglas</u> so broadly.

In a lengthy dissent to this court's refusal to rehear <u>Douglas</u> en banc, 163 F.3d 223 (5th Cir. 1998), Judge Dennis, with whom four other judges agreed, noted that <u>Douglas</u> called into question our decisions in <u>Doe</u> and <u>Jones v. Flagship International</u>, 793 F.2d 714 (5th Cir. 1986), in which we allowed an attorney to sue her employer for sex discrimination.

Judge Jolly, as author of the majority opinion in <u>Douglas</u>, responded to Judge Dennis's dissent by stating that <u>Douglas</u> was not meant to overrule either <u>Doe</u> or <u>Jones</u>.  Indeed, as Judge Jolly noted, <u>Douglas</u> specifically "recognize[d] as a valid means of revealing confidential information, the exceptions under Rule 1.6 of the Louisiana State bar Articles of Incorporation, Rules of Professional Conduct, LA. REV. STAT. ANN. §37:219 Ch. 4 — App., Art. 16, which permits the disclosure, once disclosure becomes necessary in a legal dispute with the employer-client."  163 F.3d at 238 (on petition for rehearing and suggestion for rehearing en banc) (citing <u>Douglas</u>, 144 F.3d at 376).  Accordingly, <u>Douglas</u> does not stand for the broad proposition advanced by Coastal and the Secretary.

[72] 709 F.2d at 1050 (emphasis added).

31

protected by attorney-client privilege." Nowhere did we state this in <u>Doe</u>; and no such rule can be inferred from our <u>Doe</u> opinion. We did not distinguish between information protected by the privilege and information not protected by it. The ARB broadly misinterpreted both our precedent on this issue and that of other circuits as well.

Further, in concluding that Coastal dismissed Willy as an <u>employee</u> because he lied about calling the TDWR, the ARB states that the "self-defense exception is tailored to the singular circumstances of the attorney-client relationship and <u>is limited to a breach of duty a lawyer owes a client</u>, not the broader array of duties an employee owes to an employer, such as promoting harmony with co-workers and dealing honestly with supervisors."[73] Not surprisingly, the ARB cites to no law to support this proposition; and we are aware of none.

Neither do we find support in the instant record for the ARB's finding that Coastal dismissed Willy solely because of his actions as an <u>employee</u>.[74] In contrast, we perceive ample evidentiary support in the record before us to indicate that Willy's call to the TDWR was made in his capacity as Coastal's attorney. None contests that Willy's call to the TDWR was in connection with a

---

[73] Emphasis added.

[74] We also question whether Coastal can maintain that it dismissed Willy as an <u>employee</u> and then assert the attorney-client privilege.

32

closure bond for one of Coastal's refineries.  Martin Hall, the refinery's engineer in charge of environmental matters, informed Keith Pardue and Troy Webb (Willy's colleagues on the Belcher Report and vocal critics of it), that he had informed Willy that Coastal might be sued because of financial-responsibility problems relating to the Corpus Christi refinery.  Coastal contends that it fired Willy because he neglected to tell them about this problem and lied about the phone call to TDWR.  It is difficult, if not impossible, to say that Willy was acting purely as an employee and not as an attorney when he made this call, especially with the knowledge that the call concerned a closure bond and a possible lawsuit, two areas that would surely be a concern of in-house counsel.

The above-emphasized language from the ARB's final order —— that the self-defense exception is limited to a breach of duty a lawyer owes a client —— is a strained interpretation of the language of the exception itself.  As noted, the Model Rules specifically provide that "[a] lawyer may reveal . . . information [relating to representation of a client] to the extent the lawyer reasonably believes necessary . . . to establish <u>a claim</u> or defense <u>on behalf of the lawyer in a controversy between the lawyer and the client</u> . . . ."[75]  That a lawyer may assert a "claim" against his client means that the client breached a duty to the lawyer, not the

---

[75]  MODEL RULES OF PROF'L CONDUCT R. 1.6(b)(2) (1983).

33

opposite, as the ARB held.  The American Bar Association endorses

this view as well:

> The Model Rules do not prevent an in-house lawyer from pursuing a suit for retaliatory discharge when a lawyer was discharged for complying with her ethical obligations.  An in-house lawyer pursuing a wrongful discharge claim must comply with her duty of confidentiality  to her former client and may reveal information to the extent necessary to establish her claim against her employer.  The lawyer must take reasonable affirmative steps, however, to avoid unnecessary disclosure and limit the information revealed.[76]

In sum, neither the current Secretary nor Coastal has directed

us to any case that can be stretched to stand for the broad

proposition espoused by the ARB, that the attorney-client privilege

is a per se bar to retaliation claims under the federal

whistleblower statutes, i.e., that the attorney-client privilege

mandates exclusion of all documents subject to the privilege.  As

we observed in Doe, "[a] lawyer . . . does not forfeit his rights

[as an employee] simply because to prove them he must utilize

confidential information,"[77] and we are disinclined to hold that he

has.  The ARB seriously misinterpreted our — and other circuits'

— case law treating the attorney-client privilege.  There are

ample opportunities – such as those adverted to in both Doe and

Kachmar – to protect privileged information such as that which

Coastal now seeks to protect.  The ALJ followed these procedures,

---

[76] AMERICAN BAR ASS'N FORMAL ETHICS OPINION 01-424 (Sep. 22, 2001).

[77] 709 F.2d at 1050.

and we find no error in his doing so.

One final caveat: We are fully cognizant of the procedural posture of this case, viz., the claim of a former in-house counsel against his former employer before an ALJ only, yet no party has cited any law to us —— and we have found none —— that allows the party asserting the attorney-client privilege, to refuse to show allegedly privileged documents to a court. Indeed, when a party asserts that documents are privileged, the court must in the first instance inspect and review them to determine the applicability of the privilege. What is <u>not</u> before us is a suit involving a jury and public proceedings, so we leave that possibility for another day. Today, we merely hold that no rule or case law imposes a <u>per se</u> ban on the offensive use of documents subject to the attorney-client privilege in an in-house counsel's retaliatory discharge claim against his former employer under the federal whistleblower statutes when the action is before an ALJ.

### III. CONCLUSION

For the foregoing reasons, we reject Willy's challenge under the Appointments Clause and hold that the DOL Secretary is vested with the authority to appoint the members of the ARB, and to delegate his decision-making authority to them without violating the Appointments Clause of the Constitution. We nevertheless vacate the ARB's ruling that the attorney-client privilege mandates exclusion of the Belcher Report in Willy's action against Coastal,

35

and we remand to the ARB for a review of the merits of the original holding of the ALJ and of the previous Secretary in light of the facts that they had before them when they rendered their final decisions.

PETITION GRANTED; AFFIRMED IN PART; VACATED AND REMANDED IN PART.